UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| DENISE SLATER AND ANDREW SLATER, AS PARENTS AND NEXT FRIEND OF ROBERT SLATER, A MINOR<br>Plaintiffs<br>v.<br><br>EXETER-WEST GREENWICH REGIONAL SCHOOL DISTRICT<br>Defendant | C.A. No. 06-527 ML |

**COMPLAINT FOR JUDICIAL REVIEW OF**
**FINAL DECISION OF STATE ADMINISTRATIVE AGENCY**

**Jurisdiction**

1. This is a complaint for judicial review of a final decision of the Hearing Officer appointed by the Rhode Island Department of Education. This court has jurisdiction of this complaint pursuant to 20 U.S.C. §§ 1415(i)(2) and (3), the Individuals with Disabilities Education Act ("IDEA").

**Parties**

2. The Plaintiffs are Denise and Andrew Slater, in their capacity as Parents and Next Friends of Robert Slater. The Parents reside in West Kingston, Rhode Island.

3. The Defendant is the Exeter-West Greenwich Regional School District, with its usual place of business located at 930 Nooseneck Hill Road, West Greenwich, Rhode Island.

**Facts**

4. Robert Slater ("Bobby") is the twelve-year old son of the Plaintiffs, Denise and Andrew Slater (hereinafter referred to as the "Parents"). Bobby attended public school in the

Exeter-West Greenwich Regional School District from preschool through the sixth grade. He is now attending the Wolf School in Providence, Rhode Island where he was unilaterally placed by his Parents in September 2006.

5. Bobby has been diagnosed with a severe language based learning disability in the areas of reading and written expression characteristic of dyslexia.

6. As a direct result of his disability, Bobby exhibits significant difficulty putting information into words; retrieving words and information; perceiving phonemic differences within word pairs; formulating sentences; and spontaneously thinking of words according to specific rules. He also has difficulty with sensory integration, including the performance of tasks that requires visual, motor, prioritizing and planning skills.

7. Bobby first began exhibiting emotional difficulties relating to his reading disability in the summer after first grade, frequently crying and demonstrating frustration and anxiety. Frequently, over the past year, Bobby would arrive home upset and crying and would not want to return to school.

8. Bobby has received a variety of special education services in the Exeter-West Greenwich School District since preschool to address his learning disability.

9. During July 2005, the Parents arranged for Bobby to be evaluated by Dr. Carol Emerson, a neuropsychologist, due to concerns about his failure to progress in reading, as well as his mental health. The Parents were concerned because Bobby was showing increasing signs of depression, including crying spells, irritability, withdrawal from activities and frustration about his lack of success in school.

10. On tests administered by Dr. Emerson, Bobby scored in the average to high average range in nonverbal reasoning; in the average range for comprehension of oral vocabulary

words; and in the high average range in following complex oral directions. However, Bobby scored in the below average range in tests requiring him to put information into words, as well as phonemic awareness, sentence formulations, grammar, object naming and verbal fluency.

11. Dr. Emerson found that Bobby's ability to read was at the second grade level in July 2005, the summer before Bobby was to begin sixth grade.

12. Based upon her review of previous testing, Dr. Emerson concluded that Bobby had made an approximate gain of .8 grade levels in reading skills over the previous six years while receiving special education services from the Defendant school district.

13. In Dr. Emerson's opinion, Bobby's lack of progress was attributable in large part to the Defendant's failure to provide a sequential and consistent multi-sensory approach to reading.

14. On the state-wide NECAP test administered in the fall of 2005, Bobby scored "substantially below proficient" in both reading and mathematics. Bobby's score in reading comprehension was particularly alarming, as he answered only one question correctly out of 21, compared to a school average of 12.7 correct answers and a state average of 11.9 correct answers. In word identification and vocabulary, Bobby answered only three of ten questions correctly, compared to a school average of 7.5 and a state average of 6.7.

15. Under his Individualized Education Program ("IEP") for the 2005-06 school-year, Bobby received math, science and social studies in the regular education classroom under a collaborative program; intensive reading in a group of seven special education students five days per week; and, only beginning in February 2006, Orton-Gillingham reading instruction three days per week.

16. During the 2005-06 school-year, Bobby was provided with the Grade 6 math and science curriculum in a regular education classroom of 23 students. The math and science classes were taught by a regular education teacher, Anthony Buco, with the assistance of a special educator. Including Bobby, there were seven students with IEPs in the classroom. In regard to Bobby's social skills, Mr. Buco observed that Bobby "tends to be a little bit away from [other students in the classroom]" and that "he is not as . . . interactive with them, but with the adults he was fine."[1]

17. Mr. Buco did not observe Bobby to make "any progress in reading" during the 2005-06 school-year. He testified that Bobby was "very frustrated" with reading "so, you have to sit down with him and actually read with him, but he would be very frustrated with that." Further, Bobby "would almost become angry because he can't read the words, very frustrated, and you could see a tenseness in his face."

18. Mr. Buco also observed that Bobby was very confused with the reading instruction because "[p]eople were showing him a couple of different things and he was getting very confused with that."

19. Mr. Buco observed that, in his 22 years of teaching, "I think Bobby is a kid that I think has been so severe in a reading deficit that I have ever seen." (sic).

20. In regard to the Grade 7 curriculum, Mr. Buco testified that, in his opinion, if there is a science book used in the curriculum, Bobby "is going to have problems." Mr. Buco further opined that, "If he is in the right setting, he will probably do quite well, but I can't speak for the reading, which is a big problem."

[1] All quotations set forth in this complaint are based upon the transcripts of testimony at the Due Process Hearing conducted in August and September 2006.

21. During the 2005-06 school-year, Bobby was provided with the Grade 6 social studies curriculum in a regular education classroom of 22 students. The social studies class was taught three times per week by the regular education teacher, Danielle Smith, with the assistance of a special educator who was in the classroom two times per week. Including Bobby, there were five students with IEPs in the classroom.

22. Ms. Smith described Bobby as "a very, very bright boy, very articulate, excellent grasp of concepts . . . but when it came to anything with a written word, frustrated to the point of being completely disengaged in the class, any time he had to do any reading."

23. Ms. Smith observed that Bobby "resisted working with other children." She noted that "there were times in the class when we were working on strategic reading and he worked from the textbook and he couldn't take part in that. He didn't want to be different from everybody else in the classroom."

24. In Ms. Smith's classroom, Bobby "cried sometimes." When he worked with the aide or special education teacher, "he would have his chair tipped back and looking out the window and sometimes you would give him the materials and he would turn completely away and say, I am not going to bother with that."

25. Bobby was expected to use the sixth grade textbook, with the assistance of the special educator who would "read it to him." Ms. Smith testified that, when the special educator was not available, "it would be pretty difficult to meet the needs of all of the students with the IEPs."

26. Ms. Smith testified that she was "very frustrated" with the services that were provided to Bobby, and that she "really [didn't] know what else could be done for him."

27. Ms. Smith gave Bobby a "passing" grade in social studies, but she graded him strictly on his oral presentations. Other students were graded on their performance on written tests.

28. Ms. Smith testified that "half" of the Grade 6 social studies curriculum "was teaching strategic reading for suppository text," but "[Bobby] didn't do any of that."

29. In Ms. Smith's opinion, Bobby's inability to read "created a lot of problems for him" to access the social studies curriculum and caused him to fall behind his peers," despite his cognitive ability to understand the material.

30. According to Ms. Smith, Bobby did not fit the profile of the other students in the classroom with IEPs because Bobby's disability was based upon an inability to read, not an inability to grasp concepts or to stay on task.

31. Lee Ann DiSalvia McWeeney provided speech and language services to Bobby during the 2005-06 school year.

32. During her work with Bobby, Ms. McWeeney noted that Bobby was experiencing frustration as a result of being exposed to "different [reading] program approaches," culminating in an incident in which Bobby was crying uncontrollably.

33. Ms. McWeeney questioned the "clinical validity and therapeutic soundness of presenting two different [reading] approaches to accomplish the same goal."

34. Although Ms. McWeeney presented her concerns at a team meeting on May 26, 2006, no one involved with the team initiated any action to address her concerns.

35. Bobby was provided with "intensive reading" services by a special educator, Denise Sherman, during Grades 4 through 6. Ms. Sherman also served as Bobby's "case manager" during the 2005-06 school-year.

36. The intensive reading program met five days per week, with seven students on IEPs, including Bobby. Bobby was the "most severely dyslexic" student in the group, and the student who performed at the "lowest reading level."

37. Ms. Sherman testified that Bobby is "one of a few most disabled children I have ever worked with" in over twenty years.

38. Based upon the Woodcock Diagnostic Reading Battery, a standardized test, administered by Ms. Sherman on May 24, 2005, Bobby's "Total Reading" grade equivalent was 3.4.

39. Ms. Sherman requested permission to administer the Woodcock Diagnostic Reading Battery to Bobby in May 2006, but the Parents declined to authorize additional testing.

40. Despite the Parents' denial of permission to administer additional testing, Ms. Sherman administered the Woodcock Diagnostic Reading Battery again on May 5, 2006.

41. In Bobby's proposed IEP for the 2006-07 school-year, Ms. Sherman reported that Bobby achieved a reading score of 3.5 on the Woodcock Diagnostic Reading Battery administered on May 5, 2006, an increase of only .1 grade levels over a full year of special education services.

42. In April 2006, Dr. Emerson readministered the tests given in July 2005 to assess Bobby's progress during Grade 6. In word reading, Bobby demonstrated a gain of only .1 grade equivalency (from 1.9 to 2.0) over a nine-month period; a .2 grade equivalency gain in pseudo word decoding (from 1.9 to 2.1); a .6 grade equivalency gain in reading comprehension (2.6 to 3.2); a .3 grade equivalency gain in spelling (2.2 to 2.5); and a .2 grade equivalency gain in written expression (2.9 to 3.1). Notably, in all areas, despite the nominal gains, Bobby remained 3 – 4 years behind his peers.

43. At the time of her reevaluation, Dr. Emerson noted that Bobby was less willing to read, was more fragile and tended to shut down more easily.

44. Based upon Bobby's testing compared with his average intelligence, Dr. Emerson concluded that Bobby had not made effective progress under the school's special education program because he was not provided with specific sequential consistent multi-sensory reading instruction.

45. Bobby is stigmatized by accommodations that identify him to regular-education peers as being unable to read, and by being removed from general-education activities. Bobby does not feel like he is part of the "normal classroom" and his self esteem suffers.

46. In Dr. Emerson's opinion, Bobby needs to be taught in an immersion-based program, providing small class instruction of 7 – 8 students, with all related services provided within the classroom.

47. Bobby was also tested by Dr. Steven Imber, an educational psychologist, in August 2006.

48. In the Woodcock Diagnostic Reading Battery administered by Dr. Imber in August 2006, after Bobby had completed sixth grade, Bobby scored as follows: total reading: 2.8; reading skills: 2.6; reading comprehension: 3.8; letter-word identification: 2.8; word attack: 2.2; reading vocabulary: 5.1; and passage comprehension: 3.0.

49. More than one year earlier, in May 2005, when Bobby was completing fifth grade, the District administered the Woodcock Diagnostic Reading Battery in which Bobby scored as follows: total reading grade equivalency score of 3.4; reading skills of 3.2; reading comprehension of 3.7; letter-word identification of 2.9; word attack of 3.8; reading vocabulary of 3.9 and passage comprehension of 3.6.

50. A comparison of scores from May 2005 and August 2006 demonstrate that Bobby's reading scores on the Woodcock Diagnostic Reading Battery declined in most categories despite receiving special education services during the 2005-06 school year.

51. Based upon his testing, Dr. Imber concluded that Bobby's ability to decode words is substantially below grade level, with performance at the second- to beginning-third grade level. He also concluded that Bobby was approximately four years behind grade level in silent reading comprehension and his ability to sound out words. In regard to spelling, Dr. Imber found that Bobby was performing at the 1.7 grade level, more than five years behind grade equivalency. Further, Bobby's performance in spelling has declined since Grade 4.

52. Based upon his testing, Dr. Imber's opined that Bobby has not made effective progress in reading under the District's program.

53. In Dr. Imber's opinion, Bobby would benefit from a placement with students who have similar cognitive abilities and similar learning issues, and from a program that is based upon an immersion model that provides individualized and intensive reading intervention.

54. For the 2006-07 school-year, the Defendant proposed an IEP in which Bobby would receive instruction in a collaborative regular education classroom within the District in the subjects of math, social studies and science, with the assistance of a regular education and a special education teacher.

55. The classroom size in the collaborative classroom would range from 20-22 students, four or five of whom would be on IEPs.

56. For the 2006-07 school year, the Defendant further proposed to provide Bobby with "intensive reading" for .7 hours per day in a class of five students, and three periods of one-to-one Orton-Gillingham instruction per week.

57. During the 2005-06 school year, Bobby received 1.5 hours of "intensive reading" instruction per day.

58. The "intensive reading" instruction offered by the District for the 2006-07 school year is .8 hours **less** than Bobby received in Grade 6.

59. Ms. Sherman testified that she needed the full 1.5 hours of intensive reading during the 2005-06 school-year, and that the reduction in time "should be monitored closely."

60. In May 2006, the Parents rejected the Defendant's proposed IEP because the program proposed by the school district was essentially the same that had been provided in Grade 6, except for a **reduction** in remedial reading, and because the Parents had no observed any progress under the previous IEP. The Parents requested that the Defendant place Bobby in a private school with specialized reading instruction in order to address his serious learning disabilities.

61. On June 9, 2006, the Parents requested an Impartial Due Process Hearing with the Rhode Island Department of Education ("RIDE"), alleging that the Defendant failed to develop an individualized education program that would provide Bobby with a free appropriate public education and requesting that the Hearing Officer order placement at a private school at public expense. RIDE appointed Maureen Hobson to serve as the Hearing Officer.

62. In August 2006, before the Impartial Due Process Hearing could be completed, the Plaintiffs placed Bobby at the Wolf School, a Rhode Island certified independent school that is pending special education certification. The Wolf School services students with average to above average cognitive abilities who have demonstrated language-based learning disabilities, sensory processing difficulties and social pragmatic challenges.

63. The Wolf School provides small class sizes, with between 6 and 8 students per class, with no greater than a 1:4 student:teacher ratio. The Wolf School operates under an immersion model where all services, such as occupational therapy or speech pathology, are provided in the classroom during the course of teaching the regular curriculum. The Wolf School does not pull out any child for services. Under the Wolf School program, the regular curriculum would be delivered to Bobby in a small group at his current reading level.

**The Hearing Officer's Decision**

64. On or about November 7, 2006, after completion of the hearing, the Hearing Officer issued her Administrative Decision, a copy of which is attached hereto as Exhibit A.

65. Despite the submission of 99 proposed findings of fact by the Plaintiffs, the Hearing Officer made no findings of fact in her decision. Rather, the first 19 pages of the Hearing Officer's 21 page decision are devoted to an incomplete recitation of the testimony of the witnesses, without any findings of fact or findings concerning the credibility of any witnesses.

66. In her Administrative Decision, the Hearing Officer concluded that:

> "The parents argue that the district has provided an inconsistent approach to teaching their son to read. They argue that different modalities that have been explored by the district have resulted in their son being frustrated and stagnated as far as his education is concerned. They further argue that their son has not progressed satisfactorily in the Exeter-West Greenwich School District. However, the credible evidence is to the contrary. The district has been providing services to the student since pre-school. The evidence establishes that as time has gone on, the district has stepped up services to the student."

67. The Hearing Officer further concluded that:

> "with the assistive technology and special education services being provided to the student by the district, he is progressing with his reading at an acceptable level. The student has received such personalized instruction as has enable him to successfully master grade 6 content material. The evidence established that the student is not lagging behind in any of his academic areas."

68. Finally, the Hearing Officer concluded that:

> "it is clear that the district has consistently provided services to the student, that the services have increased over the years, and that the services have resulted in educational progress for the student."

69. Notably, in her "Review of Evidence" which purports to chronologically summarize the testimony of each witness, the Hearing Officer omitted any reference to, and failed to consider the testimony of, Danielle Smith, Bobby's classroom teacher.

70. Contrary to the Hearing Officer's conclusion rejecting the Parents' claims that Bobby was experiencing frustration as the result of his disability, Ms. Smith testified that Bobby was "frustrated to the point of being completely disengaged in the class, any time he had to do any reading;" that Bobby "resisted working with other children;" that he "cried sometimes;" and that she was "very frustrated" with the services that were provided to Bobby.

71. Further contrary to the Hearing Officer's conclusions that Bobby "received such personalized instruction as has enable him to successfully master grade 6 content material" and that he was not "lagging behind in any of his academic areas," Ms. Smith testified that Bobby's inability to read "created a lot of problems for him" to access the social studies curriculum and "caused him to fall behind his peers," despite his cognitive ability to understand the material. Ms. Smith also testified that she applied a different standard in evaluating Bobby's performance.

72. While the Hearing Officer did summarize a portion of Mr. Buco's testimony, she omitted any reference to, and failed to consider, his statements that he did not observe Bobby to make "any progress in reading" during the school year; that Bobby was "very frustrated" with reading "so, you have to sit down with him and actually read with him, but he would be very frustrated with that," and that Bobby "would almost become angry because he can't read the words, very frustrated, and you could see a tenseness in his face."

73. The Hearing Officer also neglected to make any reference to, and failed to consider, Mr. Buco's observation that Bobby was very confused with the reading instruction because "[p]eople were showing him a couple of different things and he was getting very confused with that."

74. In the same regard, the Hearing Officer made no reference to, and failed to consider the testimony of, Lee Ann DiSalvia McWeeney, the District's own speech and language specialist, who observed that Bobby was experiencing frustration as a result of being exposed to "different [reading] program approaches," testimony that was directly contrary to the Hearing Officer's rejection of the allegation that "different modalities that have been explored by the district have resulted in [Bobby] being frustrated."

75. Contrary to the conclusion of the Hearing Officer that Bobby has "consistently moved forward," the Hearing Officer failed to reference or consider the results of the 2005 and 2006 Woodcock Diagnostic Reading Batteries that demonstrated regression in reading scores; Mr. Buco's testimony that he observed no reading progress; and the opinions of Dr. Emerson and Dr. Imber that Bobby had not made effective progress in reading.

76. Further, the Hearing Officer failed to make any finding concerning the credibility of Denise Sherman's testimony, despite the evidence presented by the Parents that Ms. Sherman had administered tests without authorization, and then suppressed test results showing that Bobby had made only .1 grade equivalent progress in reading over the course of the 2005-06 school year.

77. Finally, the Hearing Officer's conclusions that "as time has gone on, the district has stepped up services to the student" and "that the services [provided by the district] have increased over the years" are directly contradicted by the undisputed evidence presented at the

hearing. During the 2005-06 school year, Bobby received 1.5 hours per day of "intensive reading" instruction. In the rejected IEP for the 2006-07 school year, the Defendant proposed to cut Bobby's time for "intensive reading" to .7 hours per day, a **decrease** of more than fifty percent.

## COUNT I

78. The Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 – 77 as if set forth here.

79. Bobby is a child with a disability who is eligible for special education and related services pursuant to the IDEA and state law.

80. As an eligible child, Bobby is entitled to a program and services that are tailored to meet his unique needs and that provide significant, meaningful benefits in light of his needs and potential.

81. The IEP proposed by the Defendant for the 2006-07 school-year was inadequate to provide Bobby with a free appropriate public education.

82. The private education services obtained by the Plaintiffs at Wolf School were appropriate to serve Bobby's needs.

83. In light of the considerable uncontroverted evidence presented by the Plaintiffs during the course of the due process hearing relative to Bobby's academic progress and emotional condition, and the Hearing Officer's selective summarization of testimony, with inexplicable omissions of any reference to one witness and to significant testimony favorable to the Plaintiffs and contrary to her conclusion, the Administrative Decision indicates a bias against the Plaintiffs.

84. The Plaintiffs are aggrieved by the Administrative Decision in that it is incorrect as a matter of law, is not supported by the preponderance of the evidence, is arbitrary and capricious, and is unwarranted by the facts established by the record.

## COUNT II

85. The Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 – 84 as if set forth here.

86. Pursuant to the terms of the IDEA and Section 300.505 of the Rhode Island Regulations Governing the Education of Children With Disabilities, informed parental consent must be obtained before the school district may conduct a reevaluation of a child.

87. During on or about May 2006, Denise Sherman, as an employee of the Defendant school district, requested permission from the Plaintiffs to conduct an evaluation of their son utilizing the Woodcock Diagnostic Reading Battery.

88. The Plaintiffs declined to grant such permission.

89. On or about May 5, 2006, Denise Sherman violated the IDEA and the substantive and procedural due process rights of the Plaintiffs by administering the Woodcock Diagnostic Reading Battery to Bobby, despite knowing that the Plaintiffs had declined to grant permission for such testing.

90. The Woodcock Diagnostic Reading Battery administered by Denise Sherman on May 5, 2006 showed that Bobby had a reading score of a 3.5 grade equivalent, an increase of only .1 grade level over a full year of special education services, evidence that would have supported the Parents' argument for a private educational placement.

91. The Defendant, by its employee, Denise Sherman, not only failed to report the results of the May 6, 2006 Woodcock Diagnostic Reading Battery to the Plaintiffs, but also destroyed and/or suppressed the results of the test and denied that the test had been administered.

92. The Plaintiffs have suffered damages as the result of the Defendant's actions, including the inability to present evidence that Bobby made only .1 grade equivalent progress over one year of special education services, evidence that would have provided significant support to their argument that Bobby did not make effective progress in reading.

WHEREFORE, the Plaintiffs pray that this Court reverse the Administrative Decision; determine that the IEP developed by the Defendant failed to provide a free appropriate public education for the Student; determine that the Plaintiffs' placement of Bobby at Wolf School was appropriate; find that the Defendant violated the IDEA; order Bobby's placement at the Wolf School; order the Defendant to reimburse the Plaintiffs for all expenses paid to the Wolf School; and award the Plaintiffs their attorneys fees and cost; and award such other and further relief as the Court deems just and appropriate.

The Plaintiffs,

ANDREW AND DENISE SLATER,
By their Attorney,

Jeffrey M. Sankey, RI Bar No. 4892
DOLAN CONNLY, P.C.
50 Redfield Street, Suite 202
Boston, MA 02212
(617) 265-3100
(617) 265-3101 Facsimile
jsankey@dolanconnly.com