STATE OF RHODE ISLAND
PROVIDENCE, Sc.

DEPARTMENT OF EDUCATION

In Re: John Doe

vs

06-23

Exeter – West Greenwich School District

ADMINISTRATIVE DECISION

Hearing Officer:
Maureen A. Hobson
222 Jefferson Blvd.
Warwick, RI 02888

HELD:

Parents seeking out of district private school placement of son with diagnosis of a learning disability bear the burden of proving that the public school district is not providing FAPE. Where evidence supports a finding of FAPE, out of district private school placement is not appropriate.

LEXICON

Student: Robert Slater

District: Exeter-West Greenwich

Witnesses: Carol Emerson, PhD. (psychologist)

Denise Slater (parent)

Jessica Robins Miller (Wolf School)

Denise Sherman (district special education teacher)

Steve Imber, PhD. (educational psychological)

Anthony Buco (grade 6 regular elem. sch. teacher)

Sheryl DiMase (summer school tutor – private)

Daniele Smith (social studies teacher)

Diana Clark (reading specialist)

Lee Ann McWeeney (language arts teacher)

Kelly Ann Charlebois (evaluator from TechACCESS)

Maureen DeCresenzo (Director of Special Education)

Parents: Robert and Denise Slater

Attorneys: Jeffrey Sankey (for the student)

Andrew Henneous (for the district)

Hearing Officer Maureen A. Hobson, Esq.

In re: John Doe

vs 06-23

Exeter-West Greenwich School District

ADMINISTRATIVE DECISION

John Doe is an eleven year old student who completed grade six at Metcalf School in June of 2006. On June 9, 2006, the parents filed a request for an Impartial Due Process Hearing (hereinafter "hearing") with the R.I. Department of Education (hereinafter "RIDE"). The complaint alleges that John Doe possesses average intelligence, but that he suffers from a severe language based learning disability in the areas of reading and written language that is characteristic of dyslexia. The complaint further alleges that John Doe exhibits attentional difficulties that are believed to be related to his struggles with his learning disability. The complaint opines that the district has failed to develop an individualized education program that will provide John Doe with a free appropriate public education (hereinafter FAPE). The parents maintain that their son requires a highly specialized program of study that provides a small class size, individualized instruction by teachers trained to work with language based

learning disabled children, specific therapy to address his speech/language needs, and occupational therapy to improve sensory integration and graphomotor skills. The parents claim that John Doe has experienced a "startling lack of progress" despite seven years of educational services provided by the district. Based upon their claims, the parents unilaterally removed the student from the Exeter-West Greenwich School District and enrolled him in The Wolf School, a private facility located in East Providence, RI, as of the commencement of school in the fall of 2006. The parents are requesting that this Hearing Officer order placement at The Wolf School at public expense.

The district has denied the allegations in the parents' complaint and argues that continued placement within the district, will provide John Doe with FAPE in the least restrictive environment consistent with the requirements of the law and regulations.

## REVIEW OF EVIDENCE

The parents' first witness was Carol Emerson, an independent clinical psychologist/neuro psychologist who the parents had hired to evaluate the student and to serve as the parents' consultant. Dr. Emerson's evaluation concluded that the student has a diagnosis of moderate to severe dyslexia. She described dyslexia as a brain function, the inability to be able to process verbal language

into smaller phonems and written symbols. Dr. Emerson stated that of the approximate 1000 children in her practice, about 12% are diagnosed with a reading learning disability. Dr. Emerson stated that with dyslexia, teaching needs to be phonic based so the child learns that certain sounds equal letters and words. She indicated that it is a repetitive process that requires a lot of time and specialized instruction. She concluded that in July 2005, the student was reading at a 2nd grade level. Dr. Emerson's testing demonstrated that the student's ability was "average to high average" in "high level reasoning and non-verbal reasoning". She further concluded that he was strong in separating two syllable words, following oral directions, solving spatial puzzles, remembering stories and pattern recognition. Her test results from July 2005 indicated that the student's reading, spelling and written expression averaged at grade 2, whereas he had completed grade 5. Only the student's reading comprehension was higher at grade 3.1. Dr. Emerson tested the student again in April of 2006. From July 2005 to April 2006, the student made academic gains from .1 years to 2.6 years. She concluded that the student made insufficient progress during that period of time. Dr. Emerson testified that the student could benefit from a small academic setting that would incorporate his individual needs into the general classroom curriculum in an "immersion setting". Dr. Emerson testified that The Wolf School has an immersion program where each classroom has a maximum of eight children. She stated that since all of the children who are enrolled at Wolf have a learning

disability, the student would feel more "normal" there than in the public school regular education classroom with pull-outs.

On cross-examination, the witness stated that she saw the student for two three hours sessions in July 2005 and for another two hours in April of 2006. She did not observe the student in class, nor speak to his teachers in preparation for her evaluation or in rendering her report. Her information as to where the student had been emotionally and educationally came from the history given by the parents and from records that the parents had provided to her. Dr. Emerson felt that neither visiting the class, nor speaking with the student's teachers was necessary. She stated that the records provided by the parents provided her with an "adequate picture" of the student's classroom performance. Dr. Emerson acknowledged that the proper educational program for the student would be multi-sensory, relying on Orton-Gillingham, Wilson or Lindamood Bell. She further admitted that such a program was being provided by the district, but that the teachers were not as experienced as she would have liked. Though the student's teachers were certified in Orton-Gillingham, she testified that "ideally", the teacher would be highly experienced.

Dr. Emerson testified that regular education children who are not learning disabled are expected to earn a year of progress for each school year. A child with severe dyslexia cannot be expected to earn a year of progress for each school year even if he or she is receiving the appropriate educational services.

Dr. Emerson advocated an immersion program in a small class without pull-outs. She testified that she reviewed the district's proposed 7th grade IEP and was aware that it involved a special educator following the student in class all day. She did not visit the class or speak to the teachers. Nor does she know whether the 7th grade IEP specified pull-outs. Dr. Emerson is not a reading specialist or a certified teacher, nor is she trained in Orton-Gillingham. Dr. Emerson did state that from at least the 4th grade forward, the district has provided the student w/an appropriate reading program.

The next witness was the student's mother. The mother testified that her child's learning disability was first noted when he was approximately four (4) years old. Testing by Child Find revealed that the student had average cognitive skills, but he did not speak as well as the other children his age. The student was referred to special education at that time and he was provided with speech and language services in pre-school. Over the years, the child has continued to receive special education services, including, at times, extended school day (ESD) and extended school year (ESY). The mother testified that her son's school program changed frequently and his reading instruction was inconsistent. She stated that her son is often frustrated and anxious as a result of his inability to perform at the level of the other children in his class. The mother testified that she had considered sending her son to private school for the 2005-2006 school year, but the district thought they could provide an appropriate program, so he

stayed in public school. Throughout the student's tenure in the public school, the mom stated that she and/or her husband have attended IEP meetings and have had open communication with school personnel. At the conclusion of the 2005-2006 school year, the parents elected to enroll their son in private school because they felt he was not making appropriate gains in the public school setting, and he was still frustrated by his lack of success and normalcy. The parents took the student for a trial run at The Wolf School. After two (2) days there, the child told them be liked the school because there were other kids like him there.

On direct and cross-examination, the mother admitted that the district had offered to provide the student with a "highly qualified" reading specialist who was certified in Orton-Gillingham over the 2006 summer, but that the parents rejected the district's offer of ESY. On the advice of her mother-in-law, who is a special education teacher, the mom and dad hired another tutor who provided the student with speech and language assistance. The mother testified that the district was sincere in its efforts to help her child, but that it has not worked out. She stated that the district has been receptive to all of her suggestions. The mother did testify that the child has developed some strategies to assist him in coping with his reading disability. Further, she and other witnesses testified that the student has excellent mechanical abilities and visual learning skills. He is adept at seeing things and quickly understanding how they work. The student often works at his father's automotive shop or spends time raising and showing farm animals.

The mother did acknowledge that the district has in recent years focused on the Orton-Gillingham reading program with specialized instruction from certified teachers, but she stated that it is not used exclusively in an immersion model as anticipated at The Wolf School. The mother testified that she is not familiar with the Exeter-West Greenwich middle school program that her son was slated to enter into this fall.

Jessica Robins Miller, the Head of School at Wolf testified about the school and the program proposed for this student. Robins Miller testified that the Wolf School opened approximately seven (7) years ago. It is state certified as an independent school for K-8. The school does not have a certified special education program. They are working on obtaining that certification presently. RIDE is requiring that the school move ahead on obtaining special education certification. Robins Miller testified that there are 48-49 students enrolled for this school year and that the students profiles are substantially similar. She stated that all of the Wolf students have average or above average intelligence and suffer from speech/language based disorders of varying types. She stated that the subject child is a typical student at Wolf.

Robins Miller testified that there are 6-8 children per class at Wolf. The instructional models call for an occupational therapist (O.T.) and a speech/language (S/L) teacher to be in the classroom with the student. She testified that everything occurs in the classroom. There are no pull-outs, no

individual resource. The Wolf program uses an "immersion model" wherein O.T. and S/L services are integrated into the classroom instruction without the direct knowledge of the children. She states those services are "invisible" because they are being provided to everyone. Robins Miller testified that the typical student at Wolf also has socialization issues, so social interaction is part of the school day.

With respect to the Wolf reading program, Robins Miller testified that there are many different curriculums, but the Orton-Gillingham program is Wolf's primary model. If Orton-Gillingham does not work for a particular student, another model is tried. She stated that there is a heavy emphasis on reading and that it is incorporated through-out the school day in academic courses.

Robins Miller testified that she did not speak with anyone from the school district, that she was not familiar with the Exeter/West Greenwich middle school, nor did she know anything about the student's proposed placement.

Dr. Steve Imber, an educational psychologist, testified at the request of the parent. Dr. Imber is an expert in "inclusion", "curriculum methodologies" and "reading disabilities". He alternately works for parents and districts. He was hired by the district originally in 1999, and then consulted again in May, 2001 when he conducted some educational testing. (Exhibit Parents' 9)

Dr. Imber determined that the student had speech and language difficulties that were being addressed by the school district. He did some classroom observation at that time and determined that the services being offered to the

student were fragmented. The student was working with two reading teachers, an occupational therapist, a speech and language specialist, a math resource and several others. He felt it was too overwhelming due to the number of people involved and the fact that the student was being "pulled out" for services. Generally speaking, in May of 2001 when the student was at the end of 1st grade, Dr. Imber found the student's scores to place him at a level ranging from pre-primer to beginning 1st grade. The student was significantly delayed, and the district was aware of it and trying to address it.

The parents consulted with Dr. Imber again in July 2006. He was shown tests that the district had administered in May 2005. (District exhibit ii). Dr. Imber testified that the district's scoring on the Woodcock tests concerned him because although the student was at the end of the 5th grade, the district's scoring was based on a 5.0 grade level. Using that basis, the district's scores for the student placed him in the 2.9 to 3.9 grade level.

Dr. Imber re-tested the student in August 2006. He stated that the student was frustrated and upset at having to sit for more testing on the first day, but was less so on the second day. Dr. Imber's Woodcock testing placed the student in the range of early to late 2nd grade in his word identification, word attack, spelling, phonics and other skills required for independent reading. He noted that the student scored at the 9th grade level in reading comprehension with the teacher reading passages to him.

Utilizing the McLeod assessment tool, Dr. Imber found that the student scored higher, from 3rd grade to 5th grade level.

Dr. Imber concluded that the student had an "opportunity" to progress more in a different setting. He advocated a small immersion placement where the student would be situated with other learning disabled kids who have average or above average intelligence.

On cross-examination, Dr. Imber admitted that a student with dyslexia may never get to grade level. He said there is no hard and fast rule that dictates success, other than it comes with greater support. Dr. Imber stated that he felt that the student was fragile in his interpersonal relations with other kids. However, he testified that he did not speak to any of the school personnel about the student's socialization. His history was from the parents.

The special education teacher, Denise Sherman testified at length about the student. Ms. Sherman is a certified special education teacher for K-8, and she has been certified to teach Orton-Gillingham for at least six years. She has been a special education teacher for 20 years, 13 of which have been in Exeter-West Greenwich.

Ms. Sherman is very familiar with the student. She provided him services from grade 3 to grade 6. For the student's 3rd grade, Ms. Sherman provided consultative services to the student's teacher regarding his difficulties in reading and the various approaches that might be utilized. Ms. Sherman was the student's

teacher in 4th grade. In the 2004-05 school year, she provided intensive reading services and ESD services 3 – 4 mornings a week for an hour. She taught the student using the Orton-Gillingham method. Ms. Sherman stated that the student certainly made progress, but that he was sometimes resistant to being there so early in the morning, and she cut back on what she wanted to accomplish at those times. The ESD was discontinued at the start of the 2005-06 school year because the parents thought it put too much pressure on their son.

For the 2005-06 school year, Ms. Sherman provided the student with intensive reading 1 ½ half hours per day within a group of 7 similarly learning disabled students. She provided direct teaching of reading, writing, spelling, etc. She also taught the student's collaborative math class within the regular education class in conjunction with the regular education teacher and a teaching assistant. The student also received 1-1 instruction using Orton-Gillingham for ½ hour, 3 times per week.

In Ms. Sherman's opinion, the student made progress in her intensive reading class. She stated that the student's disability was more severe than the other students in the reading class, so his progress was slower than others, except in the area of reading comprehension, where he had strong skills.

Ms. Sherman stated that in the collaborative math class of 23 children, the student made "very good" progress and did "very well". Ms. Sherman noted that the student's behavior and interaction with his peers was appropriate in the

intensive reading and math classes. She saw no signs of frustration; he participated fully in class and always had a lot to say.

Ms. Sherman designed the reading portion of the student's 2005-06 IEP. The IEP lists supplementary aids and services and modifications and accommodations. She stated they were all appropriate and provided. In addition, the student was provided with ESY, which is not contained within the IEP. The witness was adamant that the 2005-2006 IEP provided the student with the opportunity to progress. He did so, in reading, as well as in his academic classes. The student was at least at 6th grade level in all content areas except reading. He passed the 6th grade and made progress in reading with a modified curriculum.

Mr. Sherman participated in drafting the 2006-2007 proposed IEP. It calls for an intensive reading component to be delivered .7 hours per day for 5 days per week. The IEP also includes the use of assistive technology which would provide the student with auditory access to text content. She stated that the team was excited about it, and the district was going to provide it (Co-Writer, Write Out Loud and Telex Scholar).

The proposed 2006-2007 IEP placed the student at the middle school with his peers. She thinks that placement is appropriate as it would challenge the student to learn with others. Ms. Sherman testified that when the student exited the 6th grade, his comprehensive reading scores put him at a 4th grade level which was no surprise given the severity of his disability.

Ms. Sherman testified that she visited The Wolf School. She feels that it is an inappropriate placement for the student as it is not the least restrictive placement and it removes the student from his peers. Further, she stated that the "rigor of the content curriculum is not there for him." She feels that The Wolf School curriculum is below the student's abilities.

Ms. Sherman said she had seen the Emerson test scores. However, she stated that she focuses on the comprehension portions because comprehension is the main focus of reading. She does not focus on the individual sub tests where the student's disability prevents him from scoring.

Ms. Sherman testified that she authored district exhibit F. It demonstrates that the student has made progress. By design, the McLeod testing instrument is administered 3 times per year to all students. The results indicate that at the end of grade 5, the student was at 3.4 grade level in reading. By the end of 6th grade, he was at an early 4th grade level. The scores indicate progress given his specific disability. Ms. Sherman's testimony disputes Dr. Emerson in this regard as she stated that the scores went up merely because the student got used to the test.

Ms. Sherman also disagreed with the way in which Dr. Imber conducted his testing in August of 2006. She indicated that testing for 2 to 3 hours per day over two days was too intense in too short a time. She stated that when the student becomes fatigued, he answers too quickly and is not able to put forth his best effort. She regularly tests the student in forty-five minute intervals with a break

after twenty minutes. She also took issue with Imber's comparison of his testing versus that conducted by Exeter-West Greenwich. She administered the Woodcock Johnson Diagnostic whereas Dr. Imber administered the Woodcock Johnson III, which contains a fluency sub-test that would reduce the student's score.

Even with the discrepancies among testing instruments, all results show an instructional level of at least grade 4 in reading comprehension. Ms. Sherman concludes that the student will continue to make progress in reading and in other subject areas if provided with modifications and accommodations. She did say that the student's reduced intensive reading component under the proposed IEP should be closely monitored. She found it helpful to have the 1-1/2 hours per day.

Anthony Buco, the student's 6th grade regular education teacher also testified. He has been a teacher for 22 years, 16 of which have been at Exeter-West Greenwich teaching Math and Science. His class was an inclusion model which was co-operatively taught with a special education teacher. Mr. Buco testified that he and the special education teachers coordinated their lesson plans on a weekly basis. Mr. Buco met the subject student when the student entered his class in the Fall of 2005. Mr. Buco testified that the student was "bright", "very quiet", a "good problem solver" and "very pleasant". The teacher stated that over the course of the year, the student's self esteem went up. He eagerly participated in class and performed "quite well in group projects". Mr. Buco stated that the student's math and science content were at the 6th grade level. The student earned his grades. The teacher did not have to modify the content of his instruction for

the student, but he needed help with reading and accommodations were provided that included the supplementary aids and services identified in his IEP.

Mr. Buco was at the 2006-2007 IEP meeting. He stated that he favored placement in the Exeter-West Greenwich Middle School and felt that the student would progress academically there provided he received the aids and accommodations (TechACCESS) as set forth in the IEP. Although reading will continue to be a problem, he felt that the student would succeed if provided the necessary modifications. Mr. Buco stated that he did not observe any signs of depression with the student over the course of the year. In the 6th grade, Mr. Buco sometimes assisted the student with 1-1 reading. He denied seeing any signs that the student was embarrassed by asking for reading assistance. He testified that the other kids were oblivious to it. Mr. Buco testified that he is aware that there are special schools for reading disabled children, but that he advocates that the student remain in public school. He is progressing, he is increasing his level of participation and he is with his peers.

The next witness was Sheryl DiMase, an Orton-Gillingham certified tutor who was hired by the parents to provide the student with 1-1 services during the summer in lieu of the tutor offered by the district. Ms. DiMase administered her own tests to the student, and she found his reading level to by at a 2nd grade level. She designed her Orton-Gillingham program for the student. She could not say whether the student would progress in a small group instructional setting, as her experience is 1-1. She was aware that Exeter-West Greenwich was providing 1-1 instruction as well as small group, but she did not speak to anyone within the school district about the student. Ms. DiMase is not an educator. She possesses a BA degree in psychology and a certificate for Orton-Gillingham.

Diana Clark is a certified Orton-Gillingham instructor who has a masters degree in reading. Ms. Clark was hired as a subcontractor by the Exeter-West Greenwich school district to provide 1-1 reading instruction for the student. She

began working with him in February 2006 and continued through the end of the school year. Ms. Clark testified that her experience is with working with kids who are just like the subject student. She testified as to the specific component of her 40 minute 1-1 sessions. She provided 1-1 services for the student 3 times per week. Ms. Clark stated that when she began with the student in February, his independent reading level was at grade 1. By June, he was at a 3-4 grade level. His reading frustration level increased from grade 2 to grade 5. Ms. Clark stated that the student was making steady progress. Ms. Clark drafted the goals and objectives on page 8 of the 2006-07 proposed IEP (district's exhibit I). She testified that they are appropriate and would result in the student being able to progress in reading. Pursuant to the IEP, the student would continue to receive 1-1 instruction form an instructor certified in Orton-Gillingham. The witness testified that she is an advocate of Orton-Gillingham irrespective of whether it is given in a public or private school. However, she did say that it is best presented 1-1.

Lee Ann McWeeney is a speech and language pathologist who has been employed by the district for 23 years. She testified that she provided the student with services twice per week for 30 minutes each. She utilized the Lindamood Bell program (LIPS) in her course of instruction.

Kelly Ann Charlebois, a nationally accredited assistive technology expert from TechACCESS testified that she provides services for children with disabilities in reading and written language. Ms. Charlebois stated that the district contracted with TechACCESS specifically to evaluate the subject student and determine what assistive technology might support him with his reading and writing. At the conclusion of the evaluation, TechACCESS recommended Co-writer, Write Out Loud and Telex Scholar. With Co-Writer, the student picks out words and the computer selects other words that go with them. Write Out Loud is auditory technology and Telex Scholar is a CD format, much like books on tape. She testified that the student was excited about the prospect of using the assistive

technology devices and the IEP team was very receptive to her ideas. Ms. Charlebois stated that the assistive technologies would enable the student to access the educational material being presented at school. She stated that the technologies are not a substitute for the student's reading resource.

On cross-examination, the witness was asked about The Wolf School. She testified that she has implemented tech plans for students there also. However, she noted that Wolf does not provide IEPs, nor do they have personal computers. Wolf uses Macintosh computers exclusively, so the equipment that she identified for the student could not be utilized there. She would have to re-evaluate the student to determine what other technologies might work there.

The last witness presented was Maureen DeCrescenzo, the Director of Special Education for the district. She has been in that position for 19 years and for the 12 years previous to that Mrs. DeCrescenzo worked at the Trudeau Center. The witness testified that she first came into contact with the student through the district's early childhood screening when he was in pre-school. Exeter-West Greenwich developed an IEP for the student when he was in pre-school. When he was in kindergarten, the teacher brought forth his reading problems and the district hired Dr. Imber to evaluate the student. The district then put a reading component and speech and language services into the IEP. The student has received those services continuously since that time. Additionally, the student was provided with a reading program in ESY commencing after the 1st grade and continuing until after the 6th grade when the parents declined the district's offer of ESY. The parents advised district personnel that their son wanted to participate in some 4H activities that evidently conflicted with the ESY. The parents opted to obtain a private tutor of their own choosing, Mrs. DeCrescenzo testified relative to the 2005-06 school year. She stated that in the Fall of that year, the district continued to want to provide additional 1-1 instruction via ESD, but the parents rejected it because the student was not receptive. In October, the team met to

determine how they could provide more services within the school day. The district recommended more 1-1 instruction, but the parents refused it pending the results of the evaluations. In January 2006, after the TechACCESS and other evaluations, the team recommended 1-1 service 5 days per week. Thereafter, from February 2006 through June those services were provided by Ms. Clark and Ms. McWeeney. At the team meeting in June 2006, both providers reported progress with the student. Therefore, the IEP team recommended continuing the 1-1 services in7th grade.

The 7th grade IEP contained the 1-1 Orton-Gillingham instruction and the LIPS program, which was to be provided in class rather that as a pull-out. In addition, the student was to have been provided with a reading intervention component taught by a special educator who is trained in Orton-Gillingham in a class of 5 students. The thrust of the reading intervention component was to provide support for the student's other academic subjects.

Mrs. DeCrescenzo testified that the district did purchase all of the equipment and services suggested by TechACCESS. She stated that the Telex Scholar looks like an iPod, so it would not set the student apart from others. She stated that it does not replace reading, but that it is an accommodation to enable the student to access his academics.

For 7th grade, the student's IEP calls for continuing the Orton-Gillingham and LIPS instruction, but the student was going to get those services in the classroom rather than by pull-out. The 2006-07 IEP calls for a special educator to be with the student throughout the school day. Mrs. DeCrescenzo went to The Wolf School to observe the program. She noted that Wolf was a private school like many others, except that all of the students had learning disabilities. Further, she noted that Wolf provides elementary school services, so she concluded that transitioning the student there did not make sense since his time there would be limited. Mrs. DeCrescenzo stated the obvious, that the student cannot be cured of

his dyslexia. He needs to be provided with accommodations that will enable him to access the curriculum. She feels that the district was doing that in the least restrictive environment.

Mrs. DeCrescenzo testified that the district had arranged the student's special reading sessions to coincide with regular education "repeat " periods that are taught for everyone. "Repeat" periods are classes wherein teachers review academic content areas that have already been taught to the students. This student would be doing the same thing, 1-1 with his Orton-Gillingham and LIPS specialists. Therefore, he would not miss any academics or electives.

Mrs. DeCrescenzo summed up what other witnesses had basically concluded, this student requires appropriate accommodations to succeed in school. Those accommodations will be necessary throughout middle school, high school and college. The student will most probably never read at grade level, but with accommodations he can access the school curriculum.

There was no evidence presented that establishes that student has not performed at grade level, other than in reading.

## CONCLUSION

The parents initiated this proceeding by filing a request for a due process hearing seeking private school placement and the attendant tuition reimbursement for their son's education at The Wolf School, a private educational facility located in East Providence, Rhode Island. Based upon the Board of Regents' interpretation of the federal law, and upon recent case law (Schaffer vs. Weast 126 S.Ct 528 (2005)), it was incumbent upon the parents to carry the burden of proving entitlement to the private school placement and tuition re-imbursement.

At the outset of this discussion, the Hearing Officer would be remiss if she did not specifically note the effort that the parents and the district have put forth

to assure that the student receives a meaningful education. The parents have diligently pursued what they believe to be best for their son, and the district has gone to great lengths to provide such services as were deemed necessary to enhance the student's educational benefit. All of the witnesses who testified admitted that the student has a severe learning disability resulting from his diagnosis of dyslexia. For that reason, both the parents and the district have tried various methods to teach the student to read.

The parents argue that the district has provided an inconsistent approach to teaching their son to read. They argue that the different modalities that have been explored by the district have resulted in their son being frustrated and stagnated as far as his education is concerned. They further argue that their son has not progressed satisfactorily in the Exeter-West Greenwich School District. However, the credible evidence is to the contrary. The district has been providing services to the student since pre-school. The evidence establishes that as time has gone on, the district has stepped up services to the student.

Although there is contradictory evidence as to the student's progress, it is clear that he has consistently moved forward, albeit at a pace that is slower than his non-disabled peers.

All of the witnesses agree that the student may never achieve a reading level that is commensurate with his non-disabled peers. However, with the assistive technology and special education services being provided to the student by the district, he is progressing with his reading at an acceptable level. The student has received such personalized instruction as has enabled him to successfully master grade 6 content material. The evidence established that the student is not lagging behind in any of his academic areas. A free appropriate public education is one that enables the student to gain academic benefit from a program that is personalized for the student's needs. It does not guarantee that the student will progress at the same rate as his non-disabled peers. In the instant

case, it is clear that the district has consistently provided services to the student, that the services have increased over the years, and that the services have resulted in educational progress for the student. The district has provided a free appropriate public education for the student.

Based upon the determination that the Exeter-West Greenwich 2006-07 IEP provides the student with FAPE, it is not necessary to decide the legal and factual issues of whether The Wolf School would provide the student with a private school placement that is compensable by the district.

## ORDER

Based upon the foregoing, it is hereby **ORDERED**:

1. That the parents' request for placement at The Wolf School at public expense is hereby **DENIED**.

Entered this 7th day of November, 2006

Maureen A. Hobson
Impartial Due Process Hearing Office

## CERTIFICATION

I hereby certify that a copy of the within was sent to Jeffrey Sankey, Esq. and Andrew Henneous, Esq. at their offices of record on the 7th day of November 2006. The record of hearing and all of the exhibits have been returned to the Exeter-West Greenwich School District.