UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| DENISE SLATER AND ANDREW SLATER, AS PARENTS AND NEXT FRIEND OF ROBERT SLATER, A MINOR<br>Plaintiffs | ) | |
| v. | ) | C.A. No. 06-527ML |
| EXETER-WEST GREENWICH REGIONAL SCHOOL DISTRICT<br>Defendant | ) | |

**MEMORANDUM IN SUPPORT OF THE PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

This case arises under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C.A. § 1400, et seq., and raises the issue of whether the Defendant Exeter West-Greenwich Regional School District ("District" or "Defendant") should be required to reimburse the Plaintiffs for the unilateral placement of their son ("Bobby") in private school for the 2006-07 school year. Based upon the facts and law set forth below, the Plaintiffs submit that they are entitled to such reimbursement and request the Court to award them summary judgment, declaring that their placement of Bobby at the Wolf School was proper under the IDEA and ordering reimbursement of tuition and costs for the 2006-07 school year.

### A. Individuals with Disabilities Education Act

Congress enacted the IDEA to promote the education of children with disabilities. *See, e.g.* Schaffer v. Weast, 54 U.S. 49, 126 S.Ct. 528, 530-31, 163 L.Ed.2d 387 (2005). In order to receive federal funding, a state must "ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services

designed to meet their unique needs [and] ensure that the rights of children with disabilities and parents of such children are protected." 20 U.S.C. § 1400(d)(1); *see* Sch. Comm. of Burlington v. Dep't of Educ., 471 U.S. 359, 367, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985). A "free appropriate public education" (hereinafter referred to as "FAPE") "must include 'special education and related services' tailored to meet the unique needs of a particular child, and be 'reasonably calculated to enable the child to receive educational benefits.' " Walczak v. Florida Union Free Sch. Dist., 142 F.3d 119, 122 (2d Cir.1998) (quoting Bd. of Educ. v. Rowley, 458 U.S. 176, 207, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982)) (internal citation omitted). Where a school district fails to satisfy this statutory mandate to provide FAPE, parents have a right to reimbursement for private school tuition. Burlington, 471 U.S at 370.

In this case, the Plaintiffs submit that the Defendant failed to provide FAPE to their son, and they appeal the Administrative Decision to the contrary on the grounds that the Hearing Officer's decision is incorrect as a matter of law, is not supported by the preponderance of the evidence and is arbitrary and capricious.

**B. Summary of Facts**[1]

"Bobby" is a twelve-year old boy who formerly attended the Exeter-West Greenwich Regional School District through Grade 6. (SOF ¶ 1).[2] Bobby is a child with a disability who is eligible for special education and related services pursuant to the IDEA. Bobby suffers from dyslexia, a severe language based learning disability in the areas of reading and written expression. (SOF ¶¶ 2, 4). Dyslexia has significantly affected Bobby's educational progress and has caused him to experience frustration, discouragement and lowered self-esteem. (SOF ¶¶ 9,

[1] A detailed recitation of the facts is set forth in the accompanying "Plaintiff's Statement of Facts," which is incorporated herein by reference. These facts are summarized in this paragraph.
[2] All factual references are supported in the "Plaintiff's Statement of Facts," hereinafter referred to as "SOF" with its corresponding paragraph number.

12, 59). Bobby's reading disability has been described by one of his teachers as "severe [as] I have ever seen" in twenty-two years of working with students. (SOF, ¶ 28). Although Bobby has average cognitive abilities, (SOF, ¶ 3), his disability has caused him to lag three to four years behind his classmates in reading skills despite receiving special education services within the District for six years. (SOF ¶¶ 7, 14, 15, 55, 67-69).

During the 2005-06 school year, Bobby continued to make negligible, if any, progress in reading while receiving the special education services offered by the Defendant. (SOF ¶¶ 55-58, 65-71). Bobby was evaluated by a neuropsychologist, Dr. Carol Emerson, who found that Bobby had made an approximate gain of only .8 grade levels in reading during six years of special education instruction within the district. (SOF ¶ 15). Dr. Emerson concluded that the root of Bobby's inability to make progress was the Defendant's failure to provide him with a specific sequential and consistent multi-sensory reading program. (SOF ¶¶ 16, 58). Dr. Emerson recommended that, due to the severity of Bobby's disability, he required placement in an "immersion-based program" where Bobby would receive specialized remedial reading instruction in a structured and small class of 7 to 8 similarly disabled students. (SOF ¶¶ 60-61).

Despite Bobby's lack of progress, and contrary to Dr. Emerson's recommendation, the Defendant proposed to provide Bobby with an Individual Education Program ("IEP") for the 2006-07 school year that essentially mirrored the educational program provided during the past year, with one critical difference. (SOF ¶ 79). In complete disregard for Bobby's disability, the Defendant inexplicably proposed to *reduce* his instruction in the critical subject of intensive reading from 1.5 to .7 hours per day. (SOF ¶¶ 81-84). Because Bobby was struggling to read even with the previous array of services, the Plaintiff's rejected the IEP with the reduced reading

instruction. (SOF ¶ 89). With no other educational alternative, the Plaintiffs placed Bobby at their own expense at the Wolf School in East Providence. (SOF ¶ 1).

Due to the Defendant's refusal to place Bobby in an immersion-based program, and particularly due to the significant reduction in Bobby's reading instruction, the Plaintiffs maintain that the Defendant did not propose an IEP for the 2006-07 school year designed to assist their son to make meaningful educational progress. Moreover, the Plaintiffs submit that the Defendant violated the IDEA and their substantive and procedural due process rights by (1) administering an achievement test to Bobby, knowing that the Plaintiffs had declined to grant permission for such testing; and (2) when the test results were not favorable to the Defendant's position, by destroying or suppressing the results and by denying that the test was administered.

### C. Standard of Review

In an appeal of an administrative decision under the IDEA, a district court "shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and basing its decision on the preponderance of evidence, shall grant such relief as the court determines is appropriate.'" 20 U.S.C. § 1415(i)(2)(B). Judicial review under the IDEA "is something of a hybrid of more familiar forms of judicial decision-making, somewhere between trial *de novo* and "substantial evidence" review of a closed administrative record." Nein v. Greater Clark County School Corporation, 95 F.Supp. 961, 964 (S.D.Ind. 2000). "[T]he law contemplates an intermediate standard of review on the trial-court level - a standard which, because it is characterized by independence of judgment, requires a more critical appraisal of the agency determination than clear-error review entails, but which, nevertheless, falls well short of complete *de novo* review. Lenn v. Portland School Committee, 998 F.2d 1083, 1086 -1087 (1st Cir. 1993); *citing* Roland M. v. Concord School Committee, 910 F.2d 983, 989 (1st Cir. 1990);

Colin K. v. Schmidt, 715 F.2d 1, 5 (1st Cir.1983).

In a case such as this one, where the parties have not asked the court to consider additional evidence, a motion for summary judgment is "simply the procedural vehicle for asking the judge to decide the case on the basis of the administrative record." Nein, 95 F.Supp.2d at 974. An IDEA action, however differs from an ordinary summary judgment motion because "the district court's decision is based on the preponderance of the evidence," id., and because "the existence of a disputed issue of material fact will not defeat the motion." Viola v. Arlington Central School District, 414 F.Supp.2d 366, 377 (S.D.N.Y. 2006).

A critical predicate to the determination of this matter involves the amount of deference to be accorded to the findings of the hearing officer. It is established that the administrative proceedings must be accorded "due weight." Rowley, 458 U.S. at 206, 102 S.Ct. at 3051; *see also* Colin K., 715 F.2d at 5. It has been held that, although the exact quantum of weight is subject to the district judge's exercise of informed discretion, see Hampton School District v. Dobrowolski, 976 F.2d 48, 52 (1st Cir. 1992); G.D. v. Westmoreland Sch. Dist., 930 F.2d 942, 946 (1st Cir.1991), the judge is not at liberty either to turn a blind eye to administrative findings or to discard them without sound reason. *See* Burlington, 736 F.2d at 792 ("The court, in recognition of the expertise of the administrative agency, must consider the findings carefully and endeavor to respond to the hearing officer's resolution of each material issue."). "In the end, the judicial function at the trial-court level is 'one of involved oversight,' Roland M., 910 F.2d at 989; and in the course of that oversight, the persuasiveness of a particular administrative finding, or the lack thereof, is likely to tell the tale." *See* Lenn, 998 F.2d at 1086 -1087.

In determining the amount of weight to be given to the hearing officer's determination, "the amount of deference bestowed upon the hearing officer is increased where her findings are

'thorough and complete.'" Nein, at 965, citing Union School District v. Smith, 15 F.3d 1519, 1524 (9th Cir. 1994). *See also* Walczak,142 F.3d at 127-29 (deference is appropriate when hearing officer's review was "thorough" and demonstrated careful review of the evidence). On the other hand, where the hearing officer's findings are not thorough, accurate and supported by the evidence, her determination is entitled to little or no deference. *See* J.P. ex rel. Peterson v. County School Bd. of Hanover County, Va., 447 F.Supp.2d 553, 564 (E.D.Va.,2006) (factual findings made during the state administrative proceeding are entitled to a presumption of correctness, so long as the findings were "regularly made." Factual findings are not regularly made if they are reached through a process that is "far from the accepted norm of a fact-finding process.").

## II. LEGAL ANALYSIS

To qualify for federal funding under the IDEA, a state must offer "all children with disabilities ... a free appropriate public education." 20 U.S.C. §§ 1400(c), 1412(1). In this context, appropriateness requires that the instructional plan be custom tailored to address the handicapped child's "unique needs," 20 U.S.C. § 1400(c), in a way "reasonably calculated to enable the child to receive educational benefits." Rowley, 458 U.S. at 207; *accord* Amann v. Stow Sch. Sys., 982 F.2d 644, 647 (1st Cir.1992); Roland M., 910 F.2d at 987.

When the parents of a disabled child challenge a state-proposed IEP, and when the relief they seek includes reimbursement of expenses incurred at a private school, an award will be entered in their favor if it appears (1) that the proposed IEP was inadequate to afford the child an appropriate public education, and (2) that the private education services obtained by the parents were appropriate to the child's needs. *See* Burlington, 471 U.S. at 370; *accord* Florence County Sch. Dist. Four v. Carter, 510 U.S. 7, 12-14, 114 S.Ct. 361, 364-66, 126 L.Ed.2d 284 (1993)

(where both prongs of *Burlington* test are satisfied, court may require the state to reimburse parents for expenses incurred at a private school even though it is not on a state-approved placement list); Still v. DeBuono, 101 F.3d 888, 891 (2d Cir.1996). *See* Walczak, 142 F.3d at 129; M.S. ex rel. S.S. v. Bd. of Educ., 231 F.3d 96, 102 (2d Cir.2000).

**A. THE DEFENDANT'S PROPOSED IEP FOR THE 2006-07 SCHOOL YEAR WAS INADEQUATE TO AFFORD BOBBY AN APPROPRIATE PUBLIC EDUCATION AND TO ALLOW HIM TO MAKE MEANINGFUL PROGRESS**

A school's instructional plan, known as an IEP, is a written document that details the student's current educational level, the short-term and long-term educational goals, the specific services to be offered, and the objective criteria for subsequent evaluation, *see* 20 U.S.C. § 1401(a)(20); 34 C.F.R. § 300.346 (1992). The key element of the IDEA is the development of an IEP for each handicapped child, which includes "a comprehensive statement of the educational needs of a handicapped child and the specially designed instruction and related services to be employed to meet those needs." Burlington, 471 U.S. at 368, 105 S.Ct. 1996. The IEP is collaboratively developed by the parents of the child, educators, and other specialists. 20 U.S.C. § 1414(d)(1)(B); Honig v. Doe, 484 U.S. 305, 311, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988). Because the IEP "comprises the centerpiece of a state's IDEA-compelled response to a particular child's handicap, the critical inquiry in a case of this genre is 'whether a proposed IEP is adequate and appropriate for a particular child at a given point in time.'" Lenn, 998 F.2d at 1086, *citing* Burlington,736 F.2d at 788.

**1. The IEP proposed by the Defendant for the 2006-07 school year was not reasonably calculated to provide Bobby with "meaningful educational benefit."**

The Supreme Court has construed the statute's FAPE mandate to require "education specially designed to meet the unique needs of the handicapped child, supported by such services

as are necessary to permit the child 'to benefit' from the instruction." Rowley, 458 U.S. at 188-89. As an eligible child with a disability, Bobby is entitled to a program and services that are tailored to meet his unique needs and that provide significant, meaningful benefit in light of his needs and potential, that is, "effective results" and "demonstrable improvement" in the educational and personal skills identified as special needs. 34 CFR 300.300(3)(ii); Lenn, 998 F.2d 1083), citing Roland M., 910 F.2d 983. The educational benefit of an IEP "must be gauged in relation to a child's potential." Ridgewood Bd. of Education v. N.E. ex rel M.E., 172 F.3d 238, 247 (3d Cir. 1999) (quoting Polk v. Susquehanna Intermediate Unit 16, 853 F.2d 171, 185 (3d Cir. 1988). To fulfill this mandate a district court must "analyze the type and amount of learning" of which the student is capable. Ridgewood, 172 F.3d at 248. *See also* T.R. v. Kingwood Tp. Bd. of Educ. 205 F.3d 572, 578 (3d Cir. 2000).

There is no bright-line rule that specifies the degree of educational benefit necessary to satisfy the IDEA. *See* Ridgewood, 172 F.3d at 247. While the state is not required to "maximize the potential of handicapped children," Rowley, 458 U.S. at 213, 102 S.Ct. 3034, it must provide such children with "meaningful access" to education. Walczak, 142 F.3d at 133. Accordingly, courts have interpreted Rowley to require that an IEP offer "more than a trivial or de minimis educational benefit." Oberti v. Bd. of Education, 995 F.2d 1204, 1213 (3d Cir. 1993); *see also* Polk, 853 F.2d at 179 (IDEA "calls for more than a trivial educational benefit"). In other words, a satisfactory IEP must provide "significant learning" and confer "meaningful benefit." Polk, 853 F.2d at 184. "The provision of merely 'more than a trivial educational benefit' does not meet" the meaningful benefit requirement of *Polk.* Ridgewood, 172 F.3d at 247. *See also* T.R. v. Kingwood Tp. Bd. of Educ., 205 F.3d 572, 577 (3d Cir. 2000). Courts have held that for an IEP to be reasonably calculated to enable a child to receive an educational benefit, it must be "likely

to produce progress, not regression." Walczak at 130 (*quoting* Cypress-Fairbanks Indep. Sch. Dist. v. Michael F., 118 F.3d 245, 248 (5th Cir.1997); Frank G. v. Board of Educ. of Hyde Park, 459 F.3d 356, 364 (2d. Cir. 2006).

The various IEPs proposed by the District have not allowed Bobby to make meaningful progress in his reading disability over seven years of special education services. There is no justification to suggest that the IEP proposed for the 2006-07 school year would have improved Bobby's static performance. In fact, due to the reduction in crucial reading instruction, regression – rather than progress – was the predictable result of the Defendant's instructional plan.

First, as discussed above, the Defendant offered a program for the 2006-07 school year that essentially mirrored the services that were provided to Bobby during the previous year, except that **the Defendant actually proposed to reduce the amount of time provided for intensive reading instruction.** Specifically, under his IEP for Grade 6, Bobby received 1.5 hours of intensive reading.[3] (SOF ¶ 81-83). His special education teacher, Denise Sherman, testified that she needed the full 1.5 hours to allow Bobby to make progress. (SOF ¶ 84). Despite Bobby's lack of progress, the Defendant's proposal reduced Bobby's intensive reading instruction to .7 hours per day, a reduction of more than fifty percent. (SOF ¶ 81-83). In her testimony at the hearing, Ms. Sherman candidly acknowledged that this reduction "should be monitored closely." (SOF ¶ 84). Significantly, the Defendant effected this major change in Bobby's IEP without any documented reasoning why such a reduction would benefit him.

From the Parents' standpoint, the notion of reducing the intensive reading instruction for their son – who is reading at least three to four years below grade level - is unfathomable and

[3] The "intensive reading program" was a vital piece of Bobby's reading program. Ms. Sherman described it as "an alternative reading program for those students who are below grade level and are unable to reach standards within the regular classroom setting under the regular curriculum." (Sherman Testimony, 8/23/06, p. 6).

unacceptable. Certainly, there is a disagreement between the Plaintiffs and the Defendant in this case whether Bobby has made meaningful progress in reading. The Plaintiffs have staked out their position on the belief that there has been no such progress. On the other hand, the Defendant claims that, as a result of its past services and accommodations, Bobby has made meaningful gains. Regardless of how the Court resolves this issue, the Defendant surely cannot be found to have offered FAPE while, at the same time, *reducing* the exact reading instruction that, if the Defendant is to be believed, was instrumental in prompting Bobby's gains. For this reason alone, the court should find that the Defendant's IEP does not provide FAPE.

Second, even if the instructional time had not been reduced, the nature of remedial reading required by Bobby calls for more intensive services than the collaborative program that is offered by the Defendant. The Defendant proposes to provide math, science and social studies instruction to Bobby in a collaborative setting of 20 – 22 students, four or five of whom will also be on IEPs. (SOF ¶ 80). While a special educator will be in the classroom along with the regular education teacher, the nature of this remediation will cause Bobby to become reliant on accommodations as the substantive content of the curriculum becomes more difficult, and will also stigmatize Bobby among his regular education peers who will readily observe the increasing amount of help that he will require. (SOF ¶ 59). Opposite to the Defendant's proposal, Drs. Emerson and Imber have concluded that Bobby needs to be taught in a an immersion-based program, providing small class instruction of 7 – 8 students, with all related services provided within the classroom. (SOF ¶¶ 60-61, 72). During the hearing, the Defendant did not offer any expert testimony to rebut the opinions of Drs. Emerson and Imber.

The collaborative approach to accommodate Bobby's reading ability has not been successful in the past. Bobby's regular education teachers, Anthony Buco and Danielle Smith,

both testified that, when grade equivalent reading was required in the classroom, Bobby's disability was accommodated by having the teacher "read to him" in the classroom. (SOF ¶ 24, 35). They described that Bobby became "very frustrated" when reading was required, to the point that he became "completely disengaged." (SOF ¶ 26, 31). Ms. Smith stated that, whenever a special educator was not available, "it would be pretty difficult to meet the needs of all the students with the IEPs." (SOF ¶ 36). Under the Defendant's proposal, especially with the increased reading required under the Grade 7 curriculum, it is simply unrealistic to expect that a single special educator can adequately address Bobby's severe reading disability, while at the same time assisting other needy students. Furthermore, and more importantly, reading "to" Bobby does not address his need to learn to read, and the "accommodation" becomes a crutch which allows him to avoid learning the skill on his own. For this reason, the Plaintiffs support the Wolf School model, described below, which operates to present material to the student at his or her reading level. The Parents desperately wish to avoid recurrence of another situation, described by Ms. Smith, where Bobby did not participate in half of the social studies curriculum because of his disability, even though he had the intellectual ability to understand the material. (SOF ¶ 32, 39).

In regard to the emotional difficulties presented by the District's proposed IEP, it is critical to bear in mind that, as he has aged, Bobby acutely recognizes that he is "different than other kids," and that his self esteem has suffered. (SOF ¶ 9). Denise Slater testified that Bobby has been teased about his disability, often returned home crying and did not want to return to school. (SOF ¶ 11). These obstacles will only increase during the more socially-conscious teenage years. Bobby's regular education teacher, Anthony Buco, candidly acknowledged that Bobby does not easily interact with other children. (SOF ¶ 23). Danielle Smith, testified that

Bobby "resisted working with other children" and that he avoided seeking help because "[h]e didn't want to be different from everybody else in the classroom." (SOF ¶ 32). The District's proposed IEP does not address Bobby's increasing withdrawal; to the contrary, it forces him to submit to more frustration and embarrassment.

Finally, the District has failed, and continues to fail, to provide a program that consists of a sequential and consistent multi-sensory approach to reading. Dr. Imber noted the problem in his 2001 report. (SOF ¶ 64). Dr. Emerson emphasized the issue in her 2005 evaluation. (SOF ¶ 16). Ms. McWeeney personally observed the results of the inconsistency when she worked with Bobby during the spring of 2006, as she noted that Bobby was experiencing frustration as a result of being exposed to "different [reading] program approaches," culminating in an incident in which Bobby was crying uncontrollably. (SOF ¶ 44). Ms. McWeeney appropriately questioned the "clinical validity and therapeutic soundness of presenting two different [reading] approaches to accomplish the same goal." (SOF ¶ 45). Nonetheless, even after Ms. McWeeney presented her concerns at a team meeting on May 26, 2006, the Defendant did not initiate any action to address the problem. (SOF ¶ 46).

**2. Bobby has not made meaningful progress under the District's programs to date, and the proposed IEP does not provide the opportunity for such progress.**

An IEP and placement must be reasonably calculated to provide the opportunity for meaningful – rather than trivial or minimal – educational progress in all areas of need. Rowley, 458 U.S. at 182; Ridgewood, 172 F.3d at 247 (the IDEA requires "a great deal more than a negligible benefit"). "[A] modicum of developmental achievement does not constitute a satisfactory education" and does not comply with *Rowley*. Beth B. v. Van Clay, 282 F.3d 493, 499 (7th Cir. 2002). When gauging substantive compliance with the IDEA, the educational

benefit to the child "must be gauged in relation to the child's potential, so that when a student displays considerable intellectual potential, the IDEA requires a great deal more than a negligible benefit." Nein, 95 F.Supp.2d at 974.

In the Nein case, a federal district court judge addressed startlingly similar issues to those presented in Bobby's case. Because of its similarity, the case is worthy of careful analysis. In that case, the parents of a 12-year old dyslexic boy placed their son in a private school after he made minimal progress under the school district's programs for four years. Testing revealed that the child had average cognitive abilities. During his years in special education, the district provided the child with various reading programs and accommodations, including oral reading of tests, small group instruction and modification of the grading scale. Id. at 966. Nonetheless, the boy was unable to read such basic items as a restroom sign. Id. at 977. By the end of *fourth grade*, when testing showed that the boy was reading at *below second grade level*, the parents rejected the proposed Grade 5 IEP and placed their son in a private school that exclusively taught dyslexic children. The IEP that was proposed by the district essentially mirrored the IEP for the previous school year. Id. at 968, 978.

After a hearing, the hearing officer found that the district had failed to provide FAPE and ordered reimbursement to the parents, finding that the parents' unilateral placement of the child in the private school was appropriate. On appeal, the court upheld the hearing officer's decision, rejecting the school district's argument that child had made meaningful progress because he had progressed in reading "at the rate of about half a year per year of school." The court also rejected the district's claim that the child's grade level promotion constituted evidence of progress. Id. at 972. Focusing on the child's average cognitive ability, the court held that "the IDEA requires a great deal more than negligible benefit." Id. at 974. Further, the court

recognized that "evidence that a child has made some 'minimal improvement' does not necessarily show the school has satisfied the Rowley standard." Id. In summary, the court concluded that "merely trivial or minimal progress is not sufficient, at least when there is reason to expect that a child should be able to make meaningful educational progress with appropriate and necessary services. Id. at 975.

Upon application of the Nein standard, and based upon the following evidence, it is clear that Bobby has not made the "meaningful progress" mandated by the IDEA.

**(a)** ***Anecdotally, those closest to Bobby have not observed progress.***

Anthony Buco, who was Bobby's regular education teacher for science and math, testified that he had never seen a student with "so severe [of a] reading deficit" in his 22 years of teaching, and that he did not observe "any progress in reading" during the school year. (SOF ¶ 25, 28). Danielle Smith provided poignant examples of Bobby's frustration and disengagement from class, his inability to access the curriculum and her own frustration with her inability to determine "what else could be done for him." (SOF ¶ 30-37). Denise Slater testified that, while working with Bobby on his homework each night, she had not noticed any improvement in his ability to read." (SOF ¶ 73). According to his mother, Bobby struggles to read such basic items as a menu, a museum exhibit or a fortune cookie. (SOF ¶ 8).

**(b)** ***Standardized test results do not demonstrate meaningful progress.***

The relevant standardized test results are summarized in the Parents' proposed Findings of Facts, as well in the various exhibits. Among the myriad results, Dr. Emerson's nine-month comparison between Bobby's performance during July 2005 and April 2006 is most compelling. (SOF ¶ 55). Her findings caused her to conclude that Bobby had not made gains commensurate

with his cognitive ability.[4] (SOF ¶ 58). Dr. Emerson concluded that Bobby's reading ability remained a solid 3 – 4 years behind his peers, which is a substantially greater disparity than the child in the Nein case.

Dr. Imber also compared Bobby's performance on the District's 2005 Woodcock Diagnostic Reading Battery with his performance on the same test that he administered in July 2006. (SOF ¶ 66-67). Dr. Imber's findings show stagnant progress, with some regression of reading skills, consistent with Dr. Emerson's conclusion that Bobby is reading at the second to beginning-third grade levels.

Sheryl DiMase, a trained Orton-Gillingham instructor, administered reading assessments to Bobby in June 2006. She found that Bobby was in the first percentile compared to his peers in reading and spelling. (SOF ¶ 77-78).

While Denise Sherman – who had been Bobby's primary reading instructor for three years – testified, with no lack of self interest, that Bobby had made progress in reading, her opinion is contradicted by her own testing.[5] In assessing the number of words read correctly per minute during three assessment during the 2005-06 school year, Ms. Sherman was forced to concede that the *percentage* of words read correctly by Bobby actually decreased during the school year, and that, in regard to reading comprehension, Bobby actually regressed from late Grade 4 to early Grade 4 from January to May 2006. (SOF ¶ 50).

---

[4] Notably, Dr. Emerson found that Bobby's greatest gain – which was only .6 grade equivalency – was in the area of reading comprehension. As Dr. Emerson explained, this was the likely result of Bobby's ability to apply known words to help decipher the meaning of an unfamiliar passage. However, in tests that more strictly related to pure reading skills, Bobby's progress was nominal at best: word reading (+.1), pseudo word decoding (+.2), spelling (+.3) and written expression (+.2). It is also significant to note that, *even in Bobby's strongest area* – reading comprehension – if Bobby continues to make the same .6 gain over the remaining six years of public education, he will graduate from high school with a sixth grade reading comprehension grade equivalency.

[5] Please refer to section C below regarding Sherman's testing practices, which demonstrate a gain of only .1 grade equivalency levels on the "Total Reading" scale of the Woodcock Diagnostic Reading Battery from May 2005 to May 2006.

**(c) *The goals established by the Defendant for Bobby demonstrate that Bobby has not made meaningful progress.***

Under the IDEA, an IEP must include a "statement of measurable annual goals, including benchmarks or short-term objectives" and must describe how progress toward those goals will be measured and how the parents will be kept informed of such progress. 34 C.F.R. § § 300.347(a)(2), (7). This includes "objective criteria and evaluation procedures and schedules for determining, on at least an annual basis, whether instructional objectives are being achieved." 20 U.S.C. § 1401(a)(20). Under the criteria established by the Defendant in Bobby's IEP, Bobby has not demonstrated meaningful progress.

Bobby's reading goal under his 2005-06 IEP was to read 120 words correctly per minute. (SOF ¶ 85). Under the proposed 2006-07 IEP, Bobby's goal was increased to read 127 words correctly per minute. (SOF ¶ 88). This nominal increase (120 to 127) hardly substantiates the amount of reading progress claimed by the Defendant.[6] If anything, it is evidence of no more than the "trivial advancement" that the Supreme Court has held to be inadequate. Rowley, 458 U.S. at 197 n. 21, 189, 102 S.Ct. 3034. Further, the goal is completely unrealistic, as the District's own test results demonstrate that Bobby was only reading 65 words per minute correctly in May 2006. (SOF ¶ 86). Clearly, if at year end Bobby was reading at a level of only 54% of his IEP goal, it is difficult to credit any argument that Bobby is making effective progress. Unfortunately, rather than acknowledge that Bobby continues to fall further behind his peers and honestly adjust the goals to reflect reality, the Defendant chose to perpetuate the myth of "progress" by setting a new goal that is even higher and, unfortunately, unattainable under the proposed program.

[6] Certainly, if Bobby's reading grade equivalency had increased two or three or even more grade levels as the Defendant claims, one would expect the annual goal set forth in the 2006-07 IEP to have increased more than seven words per minute.

**(d) *Bobby's receipt of "passing" grades and grade level promotion is not evidence of meaningful progress.***

The record is clear that Bobby's grades were based upon a modified curriculum. For instance, Ms. Smith testified that she gave Bobby a "passing" grade in social studies, but she graded him strictly on his oral presentations. Other students were graded on their performance on written tests. (SOF ¶ 38). She also testified that "half" of the Grade 6 social studies curriculum "was teaching strategic reading for suppository text," but "[Bobby] didn't do any of that." (SOF ¶ 39). Bobby's inability to read "created a lot of problems for him" to access the social studies curriculum and caused him to fall behind his peers," despite his cognitive ability to understand the material. (SOF ¶ 40). Nonetheless, Bobby "passed" her class and was promoted to Grade 7. While Ms. Smith's willingness to informally accommodate Bobby's disability by grading him on criteria different from other students is admirable, the resulting grades and the "passing" of the class overstate his progress.

In its analysis of the relationship of "passing" with "meaningful progress," the Nein court stated that "[w]e do not hold today that every handicapped child who is advancing from grade to grade in a regular public school system is automatically receiving a 'free appropriate public education." Nein, 95 F.Supp.2d at 977. The court recognized that the accommodations of grading on a modified scale and reading tests to the student, as well as the school's policy of social promotions, discounted the use of "promotions" as a measure of progress. Id. *See also* Rowley, 458 U.S. at 203, 102 S.Ct. 3034 (a student's grades are not dispositive of progress).

Finally, one last finding of the Nein court deserves particular emphasis. In Nein, the court awarded private school reimbursement to the parents after the district, when confronted with evidence of the child's failure, "proposed to continue the same special education services [the child] had been receiving for the prior three years." Id. at 978. In this case, under similar

circumstances, the Defendant is not offering Bobby the "same" services. To the contrary, the Defendant proposes an IEP with even *less* services, actually reducing remedial reading instruction by .8 hours per day. Accordingly, the Defendant's proposed IEP should be found to deny FAPE to Bobby.

**B. BOBBY'S PLACEMENT AT WOLF SCHOOL IS REASONABLY TAILORED TO MEET HIS SPECIAL EDUCATIONAL NEEDS.**

The IDEA authorizes a district court reviewing the outcome of a due process hearing to "grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C)(iii). The Supreme Court has read this provision, as it appeared in the predecessor to the IDEA, as empowering a court "to order school authorities to reimburse parents for their expenditures on private special education for a child if the court ultimately determines that such placement, rather than a proposed IEP, is proper under the Act." Burlington, 471 U.S. at 369, 105 S.Ct. 1996. In accordance with this holding, parents "are entitled to reimbursement *only* if a federal court concludes both that the public placement violated IDEA and that the private school placement was proper under the Act." Florence County, 510 U.S. at 15, 114 S.Ct. 361. Mr. I. ex rel. L.I. v. Maine School Admin. Dist. No. 55, 2007 WL 641988, 18 (1ST Cir. 2007); Viola v. Arlington Central School District, 414 F.Supp.2d 366 (2006); Roland M., 910 F.2d at 1000. "The rationale for allowing reimbursement is that a town should be required to pay for that education which it should have been providing all along." Norton School Comm. v. Massachusetts Department of Education, 768 F.Supp. 900, 907 (D.Mass. 1990).

The Parents have chosen to enroll Bobby at Wolf School based upon their belief that the school's immersion program will allow Bobby to make meaningful progress to address his reading disability. Wolf School is certified by the Rhode Island Department of Education as an independent school, and has been an approved placement for children receiving special

education services under an IEP from both Rhode Island and Massachusetts school districts. (SOF ¶ 91).[7] Wolf School services students with average to above average cognitive abilities who have demonstrated language-based learning disabilities, sensory processing difficulties and social pragmatic challenges. (SOF ¶ 92). Wolf School provides small class sizes, with between 6 and 8 students per class, with no greater than a 1:4 student:teacher ratio. (SOF ¶ 93). Wolf School operates under an immersion model where all services, such as occupational therapy or speech pathology, are provided in the classroom during the course of teaching the regular curriculum. (SOF ¶ 94). The Wolf School does not pull out any child for services. (SOF ¶ 94). Wolf School's reading program is based upon Orton-Gillingham, supplemented by other programs. (SOF ¶ 95). All teachers are Orton-Gillingham certified. (SOF ¶ 95). Under the Wolf School program, the regular curriculum would be delivered to Bobby in a small group at his current reading level. (SOF ¶ 96).

Bobby's emotional needs will be best served by the Wolf School, in that his grouping with similarly disabled children will eliminate the stigma attached with pullouts and in-class accommodations offered by the Defendant. (SOF ¶ 61). The Wolf School model of remedial reading satisfies Dr. Emerson's recommendation that Bobby will best be placed in an immersion-based program, with a small class size, and with all related services and sensory supports provided within the classroom. (SOF ¶ 60). Further, Bobby will benefit from an environment where he learns along with other children who share a similar disability. Such an arrangement will enhance Bobby's self esteem and reduce his frustration, as he recognizes that other children share his learning challenges. (SOF ¶ 61). Dr. Imber concurs with Dr. Emerson's opinion that

[7] At the time of the hearing, Wolf School had applied for certification from the state of Rhode Island as a special education school but had not received certification. Since the hearing, Wolf School has been certified by the state.

Bobby will be better served in an environment where he can learn beside children with similar cognitive abilities and learning issues. (SOF ¶ 72).

**1. The Plaintiffs' school selection for Bobby need not be "perfect."**

In evaluating the Plaintiffs placement, it is important to bear in mind that a parentally-chosen program need not be perfect; rather, it must be appropriately responsive to a student's special needs so that the student can benefit educationally. *See* M.S., 231 F.3d at 105 (citing Warren G. v. Cumberland County Sch. Dist., 190 F.3d 80, 84 (3d Cir.1999) (holding that "the test for the parents' private placement is that it is appropriate, and not that it is perfect")). Frank G. v. Board of Educ. of Hyde Park, 459 F.3d 356, 363 -364 (2d Cir. 2006). "It is not necessary for a parent, when faced with a pressured decision of where to place her child, to seek out the perfect alternative placement." Norton School Committee, 768 F.Supp. at 910. *See also* Board of Education of Montgomery County v. Hunter, 84 F.Supp.2d 702, 706 (D.Md.2000) (rejecting school district's argument that private educational placement was improper because it was not the least restrictive environment; because school district had failed to provide FAPE, the district's argument was "inconsequential"); Colin K. v. Schmidt, 536 F.Supp. 1375, 1386 (D.R.I. 1982) (reimbursement allowed where parents' placement appropriate, even though court could not say from the record if parents' placement was minimally necessary).

**2. The Parents' placement is not precluded by consideration of "Least Restrictive Environment" principles.**

It is well settled that, when a parent is forced to find services for their child after the school district fails to offer an appropriate IEP, parents are not held to the same strict standard with respect to least restrictive environment as are school districts. A parent's inability to place his or her child is a less restrictive environment is not considered an automatic bar to reimbursement. M.S. v. Board of Education of the City School District of Yonkers, 231 F.3d 96,

102, 105 (2d Cir. 2000), citing Cleveland Heights-University Heights City School Dist. V. Boss, 144 F.3d 391, 400 (6th Cir. 1998). The federal requirement that a student be placed in the least restrictive environment is not absolute. The statutory language itself includes the qualifying language "[t]o the maximum extent appropriate." § 1412(a)(5)(A). Furthermore, "mainstreaming is not required in every case." Nein, 95 F.Supp.2d at 981. Least restrictive environment principles cannot justify an inappropriate placement – for example, a placement that would provide de minimus educational benefits to a student with respect to his most pressing academic need. Burlington, 471 U.S. 359, 369 (1985) (IDEA provides for placement in more restrictive setting at public expense where less restrictive placement is not possible); Roland M., 910 F.2d at 993 ("desirability of mainstreaming must be weighed in concert with the Act's mandate for educational improvement"); Hartmann v. Loudoun County Board of Education, 118 F.3d 996, 1002 (4th Cir. 1997) ( while IDEA encourages mainstreaming, assessment of whether the child is placed in the least restrictive environment is "ultimately a goal subordinate to the requirement that disabled children receive educational benefit"); Burlington, 736 F.2d 773, 789 n. 19 (1st Cir. 1984) (principle of least restrictive placement may not be used to cure an otherwise inappropriate placement); J.P. ex rel. Peterson v. County School Bd. of Hanover County, Va., 447 F.Supp.2d 553, 587 (E.D.Va.,2006). Thus, although the Wolf School exclusively educates students with language-based disabilities and therefore, does not present the same opportunity for mainstreaming as a placement in a public school, it cannot be concluded on that fact alone that it is an inappropriate placement.

In this case, the least restrictive environment for Bobby, an intelligent student who requires specialized instruction for learning disabilities, is not the public school where the District's proposed IEP fails to provide FAPE. Where, as the Parents' experts have testified,

Bobby stands to benefit educationally and emotionally from a placement with similarly learning disabled children, that placement is not barred because of lack of mainstreaming, especially where the Defendants proposed to reduce services despite an abyssal record of progress.

**3. The fact that, at the time of the hearing, Wolf School was not yet approved by the state of Rhode Island as a special education school did not bar reimbursement for Bobby's placement.**

The fact that a private school selected by the parents has not been approved by a state education department is not a bar to reimbursement. Florence County School Dist. Four v. Carter, 510 U.S. 7 (1993). For example, a private placement need not provide certified special education teachers or an IEP for the disabled student. Id. In Rhode Island, the Regulations of the Regents for Elementary and Secondary Education Governing the Education of Children with Disabilities specifically provides: "A parental placement may be found to be appropriate by a hearing officer or a court even if it does not meet the State standards that apply to education provided by the SEA and LEAs." Section 300.403(c). Furthermore, a private school need not employ certified special education teachers as a condition of approval.

**C. THE DEFENDANT VIOLATED THE PLAINTIFFS' SUBSTANTIVE AND PROCEDURAL DUE PROCESS RIGHTS BY TESTING BOBBY IN MAY 2006 WITHOUT PERMISSION, AND BY THEN SUPPRESSING THE TEST RESULTS.**

Under the IDEA, a child's parents must be informed about and consent to any evaluations of their child. 20 U.S.C. § 1414(c)(3). *See* Schaffer, 546 U.S. 49, 126 S.Ct. at 532. In this case, the Defendant violated this procedural right by administering a standardized test to Bobby without parental consent on May 5, 2006.

Previously, on May 24, 2005, the Defendant's employee and Bobby's reading teacher, Denise Sherman, administered the Woodcock Diagnostic Reading Battery (referred to as the "WDRB") to Bobby. (SOF ¶ 51). On this instrument, Bobby scored a grade equivalent of 3.4 in

"Total Reading." (SOF ¶ 51). During May 2006, Ms. Sherman requested permission to re-administer the WDRB, but the Parents declined to authorize additional testing. (SOF ¶ 52).

On an unknown date during May 2006, Ms. Sherman personally drafted Goal #1 of the proposed 2006-07 IEP. (SOF ¶ 53). In Block 13 of Goal #1 of the proposed 2006-07 IEP, Ms. Sherman indicated that a WDRB evaluation had been administered on **May 5, 2006** and that Bobby had scored at a grade equivalent of **3.5**. (SOF ¶ 54).[8] The results of the evaluation were never disclosed to the parents. Instead, the existence of the test score was discovered by the Plaintiffs only while reviewing documents in preparation for the due process hearing. At that hearing, when confronted with evidence of the May 5, 2006 WDRB, Ms. Sherman denied that a test was administered to Bobby in May 2006, and testified that the entry in Block 13 of Goal #1 of Exhibit I was a typographical error and was meant to reflect testing from 2005. (Sherman Testimony, 8/23/06, pp. 73-74).

It is perhaps not surprising that the Plaintiffs' position is that, since a test score and a testing date were recorded on Bobby's IEP, the test must have been administered and should have been disclosed. At the hearing, however, when the Parents attempted to question Ms. Sherman about this vital issue, the Hearing Officer immediately interrupted the questioning, suggesting that the Parents did not have "evidence" to rebut Ms. Sherman's testimony that it was a "mistake" unless they could "come up with a Woodcock Johnson" that was administered. (Sherman Testimony, 8/23/06, pp. 73-74). In her administrative decision, the Hearing Officer made no findings or any reference to the missing test issue or Ms. Sherman's credibility.[9]

---

[8] The entry regarding the 5/5/06 testing is rather obscure within the volume of information presented in Exhibit I. It is located on the sixth (unnumbered) page of the IEP on a page entitled in the left hand corner as "Goal #1," with the specific entry set forth approximately one inch from the top in Block 13, entitled "Present Levels of Performance."

[9] With regard to a procedural matter such as this, a court should "strictly review an IEP for procedural compliance." Deal v. Hamilton County Bd. of Educ.,392 F.3d 840, 854 (6th Cir. 2004). Where a procedural violation results in "substantive harm," FAPE has been denied. Id. Furthermore, "[i]f the procedural requirements of the IDEA are met, greater deference is to be afforded to the district's placement decision." Dong, 197 F.3d at 800. On the other

Two critical observations emanate from the circumstances of the missing test: (1) Ms. Sherman's explanation for the reported data strains credibility and undermines the Defendant's placement decision, and (2) the Hearing Officer's all-too-quick dismissal of this critical issue - and her failure to even address the Plaintiffs' allegation of a serious procedural violation in her decision - demonstrates the arbitrary and capricious character of her findings.

First, in assessing the credibility of Mr. Sherman' testimony, it is important to bear in mind that the 2005 testing was completed on **5/24/05**, but the entry in Exhibit I indicates that a test was administered on **5/5/06**. At the hearing, Ms. Sherman testified that she simply transposed the wrong information from the earlier test, claiming that she mistyped not only the wrong **year** of the testing, but also the wrong **date** of the month. Even if this implausible explanation is accepted, one would expect, at the very least, that she would have accurately transcribed the correct **score** of **3.4** from the 2005 test. However, Ms. Sherman reported a different score - **3.5 -** in Block 13. While, at first glance, this difference may seem inconsequential, an increase of a mere .1 in grade equivalency on a school-administered standardized test, given immediately prior to a team meeting in which the Defendant intended to support its proposal for an in-district placement, would be a severe detriment to the Defendant's position that Bobby had made meaningful progress.

Second, the Hearing Officer's restriction of the Plaintiffs' inquiry on this issue, unless they could "come up with [the missing] Woodcock Johnson," placed an unrealistic and unfair burden of proof on the Plaintiffs. Ms. Sherman's entry in Block 13 of Exhibit I **is** evidence of a test being administered on May 5, 2006. The entry contains a date of test administration and a score that differs from any previous test. Plainly, if Ms. Sherman either destroyed or "forgot

hand, logic dictates that where the district has violated procedural requirements, its placement decision is suspect.

about" the 5/5/06 test, there would be no evidence of its existence for the Plaintiffs to find. By the Defendant's own conduct, the only evidence available to the Plaintiffs is Ms. Sherman's own unambiguous entry on their son's IEP. The Plaintiffs submit that the **evidence** supports their position that Ms. Sherman administered the WDRB on May 5, 2006, and that Bobby scored a 3.5 grade equivalent, exactly as Ms. Sherman reported in Block 13. Afterward, because the increase of .1 grade level over a full year of services demonstrated Bobby's lack of progress, the Defendant denied that the test was administered. The Defendant's procedural violation has caused the Plaintiffs to suffer substantive harm by depriving them of evidence documenting Bobby's lack of progress. Furthermore, the act of concealment has undermined the Plaintiffs' faith that the Defendant has acted in Bobby's best interest and makes it more difficult for them to agree to a placement within the district.

### D. THE ADMINISTRATIVE FINDINGS OF THE HEARING OFFICER ARE NOT ENTITLED TO ANY DEFERENCE AND SHOULD BE REVERSED BECAUSE THEY ARE NOT SUPPORTED BY THE EVIDENCE AND ARE ARBITRARY AND CAPRICIOUS.

Despite the submission of 99 proposed findings of fact by the Plaintiffs, the Hearing Officer made limited, conclusory and factually unsupported findings in her decision. Of the Hearing Officer's 21-page decision, the first 19 pages are devoted to an incomplete and inaccurate recitation of the testimony of the witnesses, without any findings concerning the credibility of the witnesses. Furthermore, in her recitation, the Hearing Officer ignored material evidence that did not sustain her determination. For instance, in her Administrative Decision, the Hearing Officer concluded that:

> The parents argue that the district has provided an inconsistent approach to teaching their son to read. They argue that different modalities that have been explored by the district have resulted in their son being frustrated and stagnated as far as his education is concerned. They further argue that their son has not progressed satisfactorily in the Exeter-West Greenwich School District.

> However, the credible evidence is to the contrary. The district has been providing services to the student since pre-school. The evidence establishes that as time has gone on, the district has stepped up services to the student. (Administrative Decision, p. 20).

Further, she states that "it is clear that the district has consistently provided services to the student, that the services have increased over the years, and that the services have resulted in educational progress for the student." (Administrative Decision, p. 21).

In these two central paragraphs, the Hearing Officer completely misstates the critical and uncontroverted evidence presented at the hearing, without a single fact to support her conclusion. First, it is not only the parents (and their experts) who have pointed out that Bobby has received "an inconsistent approach" to reading instruction. The Defendant's own employee, Lee Ann McWeeney, who was assigned to provide speech and language services to Bobby during the 2005-06 school year, testified that Bobby was experiencing frustration as a result of being exposed to "different [reading] program approaches." (SOF ¶ 44). Ms. McWeeney questioned the "clinical validity and therapeutic soundness of presenting two different [reading] approaches to accomplish the same goal." (SOF ¶ 44). Ms. McWeeney was sufficiently troubled about the teaching disparities that she presented her concerns to the staff at a team meeting on May 26, 2006. (SOF ¶ 46). [10]

Furthermore, the Hearing Officer made no reference to the testimony of Mr. Buco that Bobby was "very frustrated" with reading "so, you have to sit down with him and actually read with him, but he would be very frustrated with that," and that Bobby "would almost become angry because he can't read the words, very frustrated, and you could see a tenseness in his

[10] Despite the critical relevance of this evidence to the issue, the Hearing Officer's summary of Ms. McWeeney's testimony was limited to: "Lee Ann McWeeney is a speech and language pathologist who has been employed by the district for 23 years. She testified that she provided the student with services twice per week for 30 minutes each. She utilized the Lindamood Bell program (LIPS) in her course of instruction." The Hearing Officer made no finding whether Ms. McWeeney's testimony about the teaching disparities was credible or incredible. Rather, she simply ignored it.

face." (SOF ¶ 26). The Hearing Officer also neglected to make any reference to and failed to analyze Mr. Buco's observation that Bobby was very confused with the reading instruction because "[p]eople were showing him a couple of different things and he was getting very confused with that." (SOF ¶ 27). The Hearing Officer ignored Mr. Buco's testimony that he did not observe Bobby to make "any progress in reading" during the school year. (SOF ¶ 25).

Another classroom teacher, Danielle Smith, testified that Bobby was "frustrated to the point of being completely disengaged in the class, any time he had to do any reading" (SOF ¶ 31) and that Bobby "resisted working with other children" and that he "cried sometimes." (SOF ¶ 32). Ms. Smith testified that she herself was "very frustrated" with the services that were provided to Bobby. (SOF ¶ 37). Notably, however, the Hearing Officer's summary of the evidence omits any reference whatsoever to these observations by the Defendant's own employees.[11]

Second, the Hearing Officer's conclusion that "as time has gone on, the district has stepped up services to the student" and that "services have increased over the years" utterly flies in the face of the evidence. In this case, where Bobby has been described as having the most severe reading deficit seen by a teacher in twenty two years (SOF ¶ 27), and where Bobby's reading ability lags years behind his peers, one might reasonably have expected that evidence of a significant cut in intensive reading services - from 1.5 hours to .7 hours per day - would have drawn the attention of the Hearing Officer. Remarkably, although it was emphasized repeatedly by the Plaintiffs in their Brief, the Administrative Decision contains only one reference to this cut in services. On page 14 of the Decision, the Hearing Officer mentions in passing Ms.

[11] Arguably, Danielle Smith, the Defendant's own employee and one of two classroom teachers who testified, was the Plaintiff's most important witness because of her ability to testify concerning her direct observations of Bobby's academic performance. Inexplicably, in her summarization of the evidence, the Hearing Officer omits **any** reference to Danielle Smith as if she never testified. Danielle Smith is the only witness whose testimony was completely excluded in the Hearing Officer's summary.

Sherman's observation that "the reduced intensive reading component under the proposed IEP should be closely monitored." However, the Hearing Officer does not analyze how this substantial reduction will allow the Defendant to comply with its FAPE obligations and, most astonishingly, does not explain how the reduction is consistent with her conclusion that the Defendant has "stepped up" or "increased" services.

Furthermore, in her decision, the Hearing Officer concluded that:

> [W]ith the assistive technology and special education services being provided to the student by the district, he is progressing with his reading at an acceptable level. The student has received such personalized instruction as has enable him to successfully master grade 6 content material. The evidence established that the student is not lagging behind in any of his academic areas." (Administrative Decision, p. 20).

The testimony of Bobby's classroom teacher, Diane Smith, directly disagrees with the Hearing Officer's finding that Bobby has "mastered" the Grade 6 curriculum. In contradiction to the finding that "[t]here was no evidence presented that establishes that student has not performed as grade level, other than in reading," Ms. Smith testified that that Bobby was not exposed to "half" of the Grade 6 social studies curriculum" and that his disability "caused him to fall behind his peers." (SOF ¶¶ 39, 40).

Contrary to the conclusion of the Hearing Officer that Bobby has "consistently moved forward," (Administrative Decision, p. 20), the Hearing Officer failed to analyze or even reference the results of the 2005 and 2006 Woodcock Diagnostic Reading Batteries that demonstrated regression in reading scores; Mr. Buco's testimony that he observed no reading progress; and the opinions of Dr. Emerson and Dr. Imber that Bobby has not made effective progress in reading. Moreover, it is simply impossible to reconcile the Hearing Officer's conclusion that Bobby "is not lagging behind in any of his academic areas" in light of his scores

on the state-wide NECAP test administered in Fall 2005 in which Bobby scored "substantially below proficient" in reading and mathematics. (SOF ¶¶ 18-20).

Finally, as discussed above, it is incomprehensible that the Hearing Officer neglected to make any findings concerning the Plaintiffs' claim about the Defendant's suppression of the May 2006 test scores. Certainly, a finding that Denise Sherman administered a test without authorization, and then suppressed objective results showing a mere .1 grade equivalent progress over one year, would strongly support the Plaintiffs' position that Bobby has not made effective progress and that the Defendant has denied FAPE.

In the absence of particularized findings supported by the evidence, this Court cannot give "due weight' to the Hearing Officer's determination because there is no reliable basis to believe that the evidence was thoroughly or accurately considered. The recent *Peterson* case is illustrative of this principle. There, after reviewing a hearing officer's decision that made sparse and inaccurate findings of facts, failed to make determinations concerning the credibility of witnesses, and failed to distinguish the opinions of experts, the Court found that:

> The decision of the State Hearing Officer in this matter is so inadequate as to be of little use. The opinion selectively quotes some statements of IDEA law by the Fourth Circuit and Supreme Court and then purports to recount the testimony of each witness, but does so in terse, conclusory terms and, in most cases, this results in a distorted recitation of what the witnesses actually said. . . . [A] hearing officer's credibility determinations are to be given due weight where they are normally made. However, because the State Hearing Officer here made no credibility determinations except with respect to [the student's mother] obviously no weight can be given to the State Hearing Officer's absent credibility determination. This is particularly problematic given that the State Hearing Officer is patently wrong . . .

Furthermore, the Court noted:

> Due to the complete lack of written analysis in the State Hearing Officer's opinion, the Court has no way to judge whether the findings of fact therein were regularly made. Findings of fact 11 and 12 are entirely conclusory, being unsupported by any underlying findings of fact; and, as stated above, the State

> Hearing Officer was wrong in his observation that the parents' witnesses failed to testify to the inappropriateness of the 2005 IEP for JP at Rural Point. For the foregoing reasons, the Court cannot find that the findings of fact were regularly made; and, therefore, accords no weight to the State Hearing Officer's findings of fact and conclusions of law. Having considered the findings of the State Hearing Officer, and granted them no weight, this 'court then is free to decide the case on the preponderance of the evidence, as is required by statute.'

J.P. ex rel. Peterson v. County School Bd. of Hanover County, Va., 447 F.Supp.2d 553, 564 -566 (E.D.Va.,2006) (internal citations omitted).

Accordingly, where the Administrative Decision in this case is equally lacking, the Plaintiffs respectfully submit that this Court should apply its own review of the administrative record, finding that the Plaintiffs have established by a preponderance of the evidence that the Defendants failed to provide FAPE and that Bobby's placement at Wolf School was appropriate and subject to reimbursement.

## III. CONCLUSION

The Defendant has failed to offer educational programs and services that are reasonably calculated to provide this intelligent, but seriously learning disabled child, with FAPE. Despite seven years of special education services, Bobby continues to demonstrate no more than trivial reading progress, and he exhibits increasing frustration and withdrawal as the curriculum becomes harder to access with his limited skills. Despite this lack of progress, the Defendant's plan to provide *less* intensive reading instruction removes crucial academic support at a time when the demands of the curriculum increase, raising a probability that Bobby's reading ability will regress rather than improve. Based upon the Dedendant's failure to provide FAPE, the Parents' decision to place Bobby at the Wolf School is reasonable and appropriate to satisfy Bobby's significant educational needs.

WHEREFORE, the Parents respectfully request that the court declare that the Defendant failed to provide FAPE to Bobby and that the Plaintiffs' placement of Bobby at the Wolf School was appropriate. The Plaintiffs further request that the court order the Defendant to reimburse then for tuition and costs paid for Bobby's placement at the Wolf School for the 2006-07 school year.

Respectfully submitted,

*/s/ Jeffrey M. Sankey*___________
Jeffrey M. Sankey, RI Bar #4892
DOLAN CONNLY, P.C.
50 Redfield Street, Suite 202
Boston, MA 02122
(617) 265-3100
jsankey@dolanconnly.com