UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| DENISE SLATER AND ANDREW SLATER, AS PARENTS AND NEXT FRIEND OF ROBERT SLATER, A MINOR<br>Plaintiffs<br>v.<br><br>EXETER-WEST GREENWICH REGIONAL SCHOOL DISTRICT<br>Defendant | ) | C.A. No. 06-527ML |

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS OBJECTION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Travel

On or about May 26, 2006 a consensus of a team consisting of school personnel familiar with Robert, his parent(s), and outside consultants, proposed an Individualized Education Plan (IEP) for Robert (see Exhibit I). Robert's parents disagreed with the placement that was proposed in the IEP and asked for Robert to be placed at the Wolf School, a private school located in East Providence. On June 5, 2006 the Exeter-West Greenwich School Department ("District"), through its Director of Special Education, Maureen DeCrescenzo, provided written notice to the parents as to why the IEP team disagreed with their request and what the team relied upon in making their determination (see Exhibit C).

On June 9, 2006 the parents, through their attorney, filed a request for an Impartial Due Process Hearing. In this Request, the parents asked that "the

hearing officer order placement at Wolf School at public expense" (see page 3 of Request). On June 19, 2006 the District filed its Response. A hearing officer was appointed and hearings were held on August 10, 16, 23, and September 6, 2006. The Hearing Officer issued a written decision on November 7, 2006. In said Decision, the Hearing Officer ruled that "The District has provided a free appropriate public education for the student" and that "the Parent's request for placement at the Wolf School at public expense is denied". (Decision pp. 21-22)

The Parent's subsequently appealed the Hearing Officer's decision to this Court. A Pre-Trial conference was held on March 8, 2007 in Chambers. After said conference, the Court ordered Plaintiff to file a Motion for Summary Judgment within forty-five (45) days of the Conference and for the Defendant to file a Response within thirty (30) days thereafter.

## Facts[1]

Robert is a twelve (12) year old boy who was about to enter the seventh (7th) grade at the commencement of the hearings. Robert is a severely dyslexic child (Aug. 10, Tr. p. 23; Aug. 16, Tr. p. 145; Aug. 23, Tr. p. 119).[2] All of the parties agree that Robert is reading below his grade level. Robert's parents filed a Due Process Request asking that Robert be placed at the Wolf School. However, a consensus of the IEP team, including Robert's reading specialist, his special educator (also a reading specialist), the Director of Special Education and his science and math teacher believed the IEP proposed for the 2006-2007

[1] A more comprehensive outline of the facts is set forth in Defendant's Statement of Undisputed Facts which has been filed simultaneously with this Memorandum and is incorporated herein.
[2] All citations to Transcripts and Exhibits refer to those contained in the record of the Administrative hearing. This record was transmitted to the Court on January 18, 2007.

school year was appropriate and that Robert could be educated in the District's middle school (Aug. 23, Tr. pp. 22-27, 84, 87, 126; Sept. 6, Tr. p. 41).

Robert made progress over the period of time that the current services were in place during the 2005-2006 school year (Robert's 6th grade year). It is uncontested that with the accommodations and modifications in place Robert passed all of his classes in sixth (6th) grade (Aug. 16, Tr. p. 49; Exhibit BB). It is also uncontested that his grades were all based on an appropriate understanding of the sixth (6th) grade curriculum (Aug. 23, Tr. pp. 15-19,82, 113-114). He participated in these classes with his peers, in the least restrictive environment, and made progress in the general curriculum. This is the goal of every child with an IEP.

The 2006-2007 proposed IEP (Exhibit I) is calculated to enable Robert to benefit from instruction. It has been drafted to allow him to receive specialized reading instruction, to achieve passing marks and to advance from grade to grade. It contains over eleven (11) hours of direct special education services per week to address his reading disability. There is ample testimony on the record to this effect (Aug. 23, Tr. pp. 24-26, 84, 125-126; Sept. 6, Tr. pp. 40-48). The experienced, licensed, highly qualified professionals who deal with Robert on a daily basis and know how to interact and test him have testified that Robert will continue to make progress with the services, modifications and accommodations in this IEP.

Despite making progress in the general curriculum, and making progress in the area of his disability, Robert's parents decided to unilaterally enroll Robert

in the Wolf School and file for Due Process. The Wolf School consists of approximately 48-49 students from Rhode Island, Massachusetts and Connecticut (Aug. 16, Tr. pp. 60). Robert's seventh (7th) grade class would only consist of six (6) other children (Aug. 16, Tr. p. 91). This can hardly be considered the least restrictive environment. Additionally, Robert would not be taught by a certified special educator (Aug. 16, Tr. pp. 88-90). The witness from Wolf School was unsure whether or not her staff was "highly qualified" under No Child Left Behind (Aug. 16, Tr, pp. 87-88, 90).

Standard of Review

The district court reviews the administrative record, which may be supplemented by additional evidence from the parties, and makes an independent ruling based upon the preponderance of the evidence. That independence is tempered by the requirement that the court give due weight to the hearing officer's findings. This intermediate level of review reflects the concern that courts not substitute their own notions of educational policy for that of the state agency, which has greater expertise in the educational arena. Lt. T.B. ex rel. N.B. v. Warwick School Committee, 361 F.3d 80, 83-84 (1st Cir. 2004) (*internal citations omitted*).

Legal Argument

A. The 2006-2007 IEP was reasonably calculated to provide Robert with a free and appropriate public education.

A free and appropriate public education (FAPE) requires special education specifically designed to meet the unique needs of the handicapped child, as well as related services as are necessary to permit the child to benefit

from instruction. Board of Education of the Hendrick Hudson Central School District Westchester County v. Rowley, 102 S.Ct. 3034, 3041 (1982) A child's special education and related services are memorialized in an Individual Education Plan (IEP). An IEP must be "reasonably calculated" to provide an "appropriate" education. Roland M, v. Concord School Committee, 910 F.2d 983, 992 (1st Cir. 1990)

All of Robert's service providers testified that Robert had made appropriate progress during the 2005-2006 school year (Aug. 23, Tr. pp. 22, 25, 125,130; Sept. 6, Tr. pp. 9-10). The 2005-2006 IEP provided multiple reading services, modifications and accommodations. As of January 2005, Robert had been receiving one-on-one services with a certified Orton Gillingham reading specialist (Aug. 23, Tr. p. 118). Robert has made progress in this Orton Gillingham instruction (Aug. 23, Tr. pp. 125-126, 130; Exhibit HH). In addition, Robert continued to receive additional reading services in a small group setting (Aug. 23, Tr. pp. 11-13) as well as one-on-one services in the Lindamood Bell reading program (Sept. 6, Tr. p. 6).

The Plaintiff claims that there was no indication that the 2006-2007 proposed IEP would allow for progress. This claim appears to based upon the fact that Robert had not always made progress under earlier IEP's and the Robert was reading below grade level. Both of these arguments miss the mark. Prior IEP's were not an issue in this hearing. It is important to look at the most recent program that was delivered during the 2005-2006 school year and to determine whether progress has been made.

> "The actions of school districts cannot ... be judged exclusively in hindsight. An IEP is a snapshot, not a retrospective. In striving for appropriateness, an IEP must take into account what was, and was not, objectively reasonable when the snapshot was taken, that is, at the time the IEP was promulgated." Roland M. v. Concord School Committee, 910 F.2d 983, 992 (1st Cir. 1990).

All parties agree that various methods have been utilized with varying success. However, what was being offered is what needs to be analyzed. Testimony on the record shows progress and there is testimony indicating that continued progress was expected (Aug. 23, Tr. pp. 22, 25, 125,130).

In addition, the record is replete with testimony substantiating that Robert has a severe learning disability. Accordingly, it is not surprising that due to the undisputed severity of his reading disability, Robert is not reading at grade level (Aug. 23, Tr. p. 28). He cannot be expected to progress at the same rate as a non-disabled reader (Aug. 10, Tr. pp. 64-66). As noted by the Hearing Officer, "Mrs. DeCrescenzo stated the obvious, that the student cannot be cured of his dyslexia."(Decision p. 18) The Hearing Officer found that "[a]ll of the witnesses agree that the student may never achieve a reading level that is commensurate with his non-disabled peers". (Decision p. 20) Yet the Hearing Officer went on to find that "[w]ith the assistive technology and special education services being provided to the student by the district, he is progressing with his reading at an acceptable level." Id. This finding is supported by the testimony and evidence in the record.

Taking into account the progress observed and measured in 2005-2006, the 2006-2007 IEP is reasonably calculated to allow for progress as well. Contrary to Plaintiff's repeated assertion that less services would be provided,

**Robert would actually have access to more services**. Maureen DeCrescenzo, Director of Special Education, testified about the program offered at the middle school pursuant to the proposed IEP for the 2006-2007 school year. She explained how the same highly qualified special educator (also an Orton Gillingham trained reading instructor) would be with Robert in all of his academic classes (Sept. 6, Tr. pp. 44-46). This teacher would also provide Robert with reading instruction in a small classroom setting (Sept. 6, Tr. pp. 44-46). Robert would continue to receive one-on-one Orton Gillingham reading instruction and Lindamood Bell reading instruction (Sept. 6, Tr. p. 42). All of Robert's services would be provided within the classroom (Sept. 6, Tr. pp. 65, 79).[3]

Perhaps most important is the fact that Robert's special educator (also certified in Orton Gillingham) would be in all of Robert's academic classes and would also be the individual providing small group reading instruction to Robert. She would coordinate all of his reading services. She is also the teacher during Robert's resource period (Sept. 6, Tr. p. 45). This period can be utilized to help Robert with any and all of his class work (for any subject), and also provides another opportunity to provide reading instruction (Sept. 6, Tr. p. 46). In the 2005-2006 school year Robert did not have a resource period. With the addition of this period, taught by the certified special educator and reading specialist, Robert can receive additional reading instruction and assistance with all of his academic course work. The resource class would focus on reading intervention

[3]With the exception of the Orton Gillingham instruction which witnesses for both the District and the parents testified was best provided one-on-one (Aug. 23, Tr. pp. 100, 147).

that is earmarked around the curriculum (Sept. 6, Tr. p. 68). The same special educator and reading specialist will be with Robert virtually all day and in all academic classes.

Finally, the record contains testimony from Tech Access as well as Robert's teacher that new technology which had been recommended would be beneficial to Robert and help him access the curriculum (Aug. 23, Tr. pp. 26-27, 86-87; Sept. 6, Tr. pp. 49-50). This technology was never given an opportunity due to the parent's unilateral withdrawal of Robert from the public schools.

B. The Wolf School is not appropriate.

To be awarded reimbursement, the parents must show not only that the IEP offered by the District did not provide FAPE, but that "the private placement desired by the parents was proper under the Act." School Committee for the Town of Burlington, Massachusetts v. Department of Education, Commonwealth of Massachusetts, 105 S.Ct. 1996, 2002 (1985) *see also* M.S. on behalf of S.S. v. Board of Education of the City School District of the City of Yonkers, 231 F.3d 96, 104 (2nd Cir. 2000). Based upon the evidence presented there will be no certified special educator working with Robert at the Wolf School. Nor does there appear to be any "main streaming" at Wolf School. While lack of certification and failure to mainstream is not a prohibition to placement, they can certainly be considered by the hearing officer when determining whether the private placement is appropriate. M.S. at 105.

Wolf School will offer Robert only six (6) age appropriate peers in his classes (or entire grade for that matter). He will be with those children for ***all***

academic instruction. Wolf School is far removed from Robert's home town. This will clearly have a negative impact on his ability to develop friendships which can exist outside of the school setting.

C. Plaintiff's substantive and procedural due process rights were not violated by alleged improper testing.

This allegation by the Plaintiff is baseless and unsubstantiated. In addition, it was directly addressed by the Hearing Officer. The witness involved testified definitively, under oath, that she did not conduct the test in question and that the notations on the 2006-2007 IEP were in error (Aug. 23, Tr. Pp. 71-75). The Hearing Officer correctly pointed out that if Plaintiff had evidence on this issue, they needed to present it (Aug. 23, Tr. p.23-24). However, no testimony nor documentation was ever presented to support their "theory". They did not present a copy of the alleged test, they did not present testimony from the student that he was given the test. There is simply nothing on the record to support their claim that a test was improperly given. When the teacher was questioned under oath, she gave a rational explanation for the scriveners error.

D. The Hearing Officer's findings are supported by the evidence and are entitled to deference.

This matter was heard by the Hearing Officer over the course of four (4) separate hearings. The Hearing Officer had the opportunity to view the testimony of each witness and review all of the exhibits that were submitted. Then, the Hearing Officer drafted a twenty-two (22) page decision. In her decision, the Hearing Officer correctly noted that the parents bore the burden of proof (Decision p. 19). The Hearing Officer held that the parents did not meet

their burden, and that their claim for placement at the Wolf School at public expense must be denied (Decision p. 22).

This case is analogous to Beitle v. East Greenwich School Committee, No. Civ. A. 06-62 ML (D.R.I Oct. 27, 2006). In Beitle, the parents argued that consideration of passing grades alone is not sufficient under the Individuals with Disabilities Act (IDEA). The Court agreed, and cited the Hearing Officer's consideration of the least restrictive environment and mainstreaming as well. Beitle at 4. The Hearing Officer in the case at bar clearly found that "based on the credible evidence" Robert had made appropriate progress through the sixth grade curriculum (Decision p.20) as well as appropriate progress in reading considering his disability (Decision p. 20). The Hearing Officer also considered that all students at the Wolf School suffer from speech language disorders of varying types (Decision p. 7). Hence, there is no mainstreaming. The Hearing Officer also found that in addition to achieving passing grades, Robert was making progress in reading, his area of disability (Decision, p. 20).

In Beitle, the parents argued, as the Plaintiff claims here, that the Hearing Officer "ignored" or "overlooked" crucial evidence. However, the Court pointed out that:

> "A review of the administrative record and the parties' memoranda reveals that the Hearing Officer was faced with conflicting evidence on may points. This court is, as noted above, required to give due deference to the Hearing Officer's resolution of these conflicts and findings of fact. Thus, the issue is not whether this court would have made the same determinations as the Hearing Officer but rather whether they are reasonably supported by the record and, if so, whether the Hearing Officer properly applied the law regarding FAPE to those findings" Beitle at 5.

The case at bar is similar. There was much conflicting testimony regarding test scores and progress introduced at the hearings. However, the Hearing Officer found that the "credible" evidence supported appropriate progress in the District. (Decision p. 20) The Hearing Officer also found that despite the conflicting testimony, the "student's reading is progressing at an acceptable level". (Decision p. 20) The Hearing Officer clearly considered all the testimony from both sides and gave it varying weight.

Her decision points out that Plaintiff's expert Dr. Emerson did not observe the student or speak with teachers when preparing her evaluation (Decision p. 4). She reflects that Dr. Emerson saw Robert for only 5 hours for testing (Decision p. 4) and that Dr. Emerson also admitted that the multi sensory program she was recommending was being provided by the District. (Decision pp. 4-5). Finally, the Hearing Officer noted that Dr. Emerson conceded that a student with severe dyslexia cannot be expected to earn a year of progress for each school year even if they are receiving appropriate educational services. (Decision p. 4)

The Hearing Officer found that although Dr. Imber, the parents' other expert, testified that Robert was fragile in his interpersonal relationships, he did not speak with school personnel about Robert's socialization (Decision p. 10). She also noted that Dr. Imber admitted that students with dyslexia may never get to grade level (Decision p. 10).

The Hearing Officer then considered that the Districts' witness, Ms. Sherman, was very familiar with Robert (Decision p. 10) and had twenty years of teaching experience (Decision p. 10). The Hearing Officer noted Ms. Sherman's

opinion that Robert's reading comprehension scores were in accord with the severity of his disability (Decision p. 12). Finally, the Hearing Officer took great care to detail Ms. Sherman's testimony regarding the testing that both the District had performed and the testing that the parent's experts had performed (Decision pp. 13-14). The Decision made reference to Ms. Sherman's concerns regarding the inappropriate testing methods and conclusions of Drs. Imber and Emerson (Decision pp. 13-14).

A thorough reading of the record below makes it clear that the Hearing Officer considered all of the testimony and exhibits presented over four days of hearing, and found in favor of the District. This Hearing Officer has been appointed by the State of Rhode Island Department of Education to hear these types of cases. By virtue of this appointment, she is the individual the state relies on for her "expertise in the educational arena". Lt. T.B. ex rel. N.B. v. Warwick School Committee, 361 F.3d 80, 83-84 (1st Cir. 2004). The Hearing Officer is therefore entitled to deference and her Decision should be upheld.

## Conclusion

Therefore, for the reasons set forth above, the Plaintiff's Motion for Summary Judgment should be denied, the Hearing Officer's Decision should be upheld and the Plaintiff's appeal of the Hearing Officer's Decision should be dismissed with prejudice.

EXETER-WEST GREENWICH
REGIONAL SCHOOL DISTRICT
By its attorneys,

*/s/ Andrew D. Henneous*___________

Andrew D. Henneous, Esq. (#5935)
BRENNAN, RECUPERO, CASCIONE,
SCUNGIO & MCALLISTER, LLP
362 Broadway
Providence, RI 02909
(401) 453-2300
ahenneous@brcsm.com

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of this Defendants' Verified Response to Plaintiffs' Statement of Undisputed Facts was sent to the following, on this the ____ day of May, 2007:

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Andrew D. Henneous**
  ahenneous@brcsm.com
- **Jeffrey M. Sankey**
  jsankey@dolanconnly.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)

/s/ Andrew D. Henneous, Esq.