UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| DENISE and ANDREW SLATER, as Parents of ROBERT SLATER | : | |
| v. | : | C.A. No. 06-527ML |
| EXETER-WEST GREENWICH REGIONAL SCHOOL DISTRICT | : | |

**REPORT AND RECOMMENDATION**

Lincoln D. Almond, United States Magistrate Judge

Before this Court is Plaintiffs' Motion for Summary Judgment (Document No. 7) pursuant to Fed. R. Civ. P. 56. The parties are the Exeter-West Greenwich Regional School District (the "District") and Denise and Andrew Slater, as parents of Robert Slater (collectively the "Slaters"). This matter was referred to me for preliminary review, findings and recommended disposition. 28 U.S.C. § 636(b)(1)(B); LR Cv 72. A hearing was held on June 11, 2007. After reviewing the Administrative Record and Memoranda submitted, listening to the arguments of counsel and conducting independent research, I recommend that the Slaters' Motion for Summary Judgment be DENIED.

**Background**

This case involves an appeal by the Slaters from a Hearing Officer's decision following an impartial due process hearing conducted pursuant to 20 U.S.C. § 1415, the Individuals with Disabilities Education Act ("IDEA"). Section 1415(i)(2)(A) of IDEA provides that any party

aggrieved by a decision made at the conclusion of an IDEA administrative hearing may bring a civil action in this Court seeking review of the decision.

The student, Robert Slater ("Bobby"), has been diagnosed with a learning disability "characteristic of dyslexia." Document No. 1 at ¶ 5. Bobby attended public school in the District through the completion of sixth grade in June 2006. At an early age, Bobby was deemed eligible for special education services under IDEA by the District. The District implemented several Individualized Education Programs ("IEP") for Bobby. The first IEP was implemented on November 25, 1998 when Bobby was four years old, and it provided him with preschool speech/language therapy. Administrative Record ("Admin. R.") Ex. 1. During Bobby's elementary school years, there were more or less annual IEPs implemented from year to year. Id., Exs. 2-6, and J. These IEPs provided Bobby with various and increasing special education supports including speech/language therapy and "intensive reading" support. Id. Bobby received extended school year (i.e., summer) services between fourth and fifth grade, Id., Ex. K, and extended school day (i.e., early morning) services during fifth grade. (Transcript "Tr." August 23, 2006 at 10).[1]

Bobby's sixth-grade IEP was developed at a meeting held on April 13, 2005. Id., Ex. J. It provided Bobby with special education support in math, science and social studies, and small group intensive reading instruction for 1.5 hours per school day. Id. Several IEP team meetings were held during Bobby's fifth- and sixth-grade years. Id., Exs. R-Z. At an IEP team meeting held on January 20, 2006, Bobby's IEP was revised to add one-on-one Orton-Gillingham ("OG") reading instruction

[1] The extended school day services were declined by Bobby's parents during sixth grade. Tr. Aug. 23, 2006 at 11. Although she "wanted to see th[ose] services continue," Bobby's special education teacher observed that it was making Bobby "really tired" and "was causing him to be just distraught" and testified that she "completely understood the reasoning behind pulling him from the service." Id.

three times per week and Lindamood-Bell ("LB") instruction twice per week. Id., Exs. J and S. See also, Tr. Aug. 23, 2006 at 12 and 120, and Tr. Sept. 6, 2006 at 6.

Bobby was scheduled to transition from elementary school to middle school in September 2006. Admin. R., Ex. BB. An IEP team meeting was held on May 26, 2006 to prepare for this transition, and the District proposed a 2006-2007 IEP for Bobby. Id., Exs. I and R. The Slaters rejected the proposed IEP and requested an out-of-district placement. Id., Ex. R. They also declined summer tutoring services from the District. Id., Ex. CC. Bobby's parents enrolled him in the Wolf School for seventh grade. The Wolf School is a small, private school located in East Providence that serves children through the eighth grade who have various learning difficulties. Although the Wolf School was not state certified in special education at the time of Bobby's enrollment, the parties agreed at the hearing that it has since received its certification.

On June 9, 2006, the Slaters requested an impartial due process hearing regarding the implementation of Bobby's IEP. Four hearing days were held in August and September 2006. The Hearing Officer issued her decision on November 7, 2006, finding that the District's 2006-2007 IEP provided Bobby with a "free appropriate public education" ("FAPE") and that the District was not financially responsible for Bobby's parental placement at the Wolf School for the 2006-2007 school year. The Slaters have appealed the Hearing Officer's decision. The Slaters dispute her finding that the seventh-grade IEP proposed by the District provided FAPE to Bobby. For the reasons discussed below, this Court concludes that the Hearing Officer's determination is legally correct, supported by the record and should be AFFIRMED.

**Standard of Review**

A district court, when reviewing an administrative decision under IDEA, is required to give "due deference" to a hearing officer's findings of fact. Abrahamson v. Hershman, 701 F.2d 223, 231 (1st Cir. 1983). However, a district court reviews a hearing officer's rulings of law under the IDEA framework *de novo*. See Ross v. Framingham Sch. Comm., 44 F. Supp. 2d 104, 111-12 (D. Mass. 1999), aff'd 229 F.3d 1133 (1st Cir. 2000). Therefore, this Court should disregard any rulings not in accordance with applicable statutes and precedents. See id. (citing Abrahamson, 701 F.2d at 231). Finally, when the issue implicates a school district's educational expertise, the courts must give "due weight" to the administrative findings because "[j]urists are not trained, practicing educators." Roland M. v. Concord Sch. Comm., 910 F.2d 983, 989 (1st Cir. 1990). See also Kevin G. v. Cranston Sch. Comm., 965 F. Supp. 261, 263 (D.R.I. 1997) ("due weight" must be given to administrative findings "because the procedural protections provided by the administrative process would be rendered meaningless if courts could simply substitute their own preferences for the administrative officers' evaluations").

When the parties choose not to submit additional evidence to the court, as in this case, there is no new factual material to be considered. Thus, the parties may ask the judge to decide the case on the basis of the administrative record by way of a motion for summary judgment. Hunger v. Leininger, 15 F.3d 664, 669 (7th Cir. 1994). This is not to be confused with the typical pre-trial summary judgment procedure in which the court must consider the facts in the light most favorable to the non-moving party. Heather S. v. Wisconsin, 125 F.3d 1045, 1052 (7th Cir. 1997). Rather,

under the IDEA, "[t]he party challenging the outcome of the...administrative decision bears the burden of proof." Id.

## Analysis

### A. The Hearing Officer's Decision as to FAPE is Supported by the Record

The Hearing Officer correctly held that the Slaters, as the party seeking relief, bore the burden of proving that the educational program offered by the District (i.e., the seventh-grade IEP) would not have provided FAPE to Bobby. Document No. 1, Ex. 1 at 19; see also Schaffer v. Weast, 546 U.S. 49, 61 (2005) (Under IDEA, the burden of proof in an administrative hearing challenging an IEP is "properly placed upon the party seeking relief."). The Hearing Officer concluded that the Slaters had not met that burden in this case and thus the Slaters' "request for placement at the Wolf School at public expense [was] DENIED." Document No. 1, Ex. 1 at 22.

In finding FAPE, the Hearing Officer found that the District "has consistently provided services to the student, that the services have increased over the years, and that the services have resulted in educational progress for the student." Id. at 21. While the Hearing Officer noted the existence of "contradictory evidence" as to Bobby's progress, she found that "it is clear that he has consistently moved forward, albeit at a pace that is slower than his non-disabled peers." Id. at 20. The Slaters dispute these findings and argue that the "various IEPs proposed by the District have not allowed Bobby to make meaningful progress in his reading disability over seven years of special education services" and the proposed 2006-07 IEP would not have improved Bobby's "static performance." Document No. 7 at 9. They argue that, in fact, the District's decision to reduce "crucial reading instruction" would predictably result in regression, not progression. Id.

When parents unilaterally place their child in a private school, as Bobby's parents did here, they are entitled to reimbursement "only if a federal court concludes both that the public placement violated IDEA and that the private school placement was proper under the Act." Florence County Sch. Dist. Four v. Carter, 510 U.S. 7, 15 (1993). (emphasis in original). While the Slaters had every right to enroll Bobby at the Wolf School while they challenged the District's IEP, they acted at their own "financial risk" in doing so. Michael C. v. Radnor Township Sch. Dist., 202 F.3d 642, 651 (3rd Cir. 2000); see also RIDOE Regulation, § 300.403. IDEA contains a "stay-put" provision which requires a child to remain in his or her "then current educational placement" pending the outcome of an IDEA proceeding. 20 U.S.C. § 1415(j). If Congress had intended that the parents' requested placement be provided during a dispute at public expense, it could have provided for such in IDEA. Schaffer, 126 S. Ct. at 536. It did not. Id.

Given the underlying burden of proof and applicable standards of administrative review, the Slaters face a difficult task in this appeal. The Slaters must convince this Court, giving "due weight" to the Hearing Officer's decision and "due deference" to her findings of fact, that the Hearing Officer erred in determining that they failed to meet their burden of proof on the issue of FAPE.[2]

The Supreme Court and First Circuit have consistently construed the FAPE requirement to mean that any given placement must provide "a reasonable probability of educational benefits with sufficient supportive services at public expense." G.D. v. Westmoreland Sch. Dist., 930 F.2d 942, 948 (1st Cir. 1991) (citing Rowley, 458 U.S. at 187-89). "Districts need not provide the optimal

---

[2] The Slaters also contend that the Wolf School is an appropriate placement for Bobby. Because she found that the District offered FAPE to Bobby, the Hearing Officer did not specifically address this argument. This Court's recommendation that the Hearing Officer's FAPE determination be affirmed also makes it unnecessary to reach the Wolf School issue.

level of services, or even a level that would confer additional benefits, since the IEP required by IDEA represents only a 'basic floor of opportunity.'" Carlisle Area Sch. v. Scott P., 62 F.3d at 520, 533-534 (3rd Cir. 1995) (quoting Rowley, 458 U.S. at 201). The test under IDEA is not whether the IEP would "achieve perfect academic results" or whether it is better or worse than a proposed alternative. Roland M., 910 F.2d at 992-993. Rather, the test is whether the IEP is "reasonably calculated to provide an 'appropriate' education." Id. "[A] FAPE may not be the only appropriate choice, or the choice of certain selected experts, or the child's parents' first choice, or even the best choice." Westmoreland, 930 F.2d at 948. (emphasis in original).

The Hearing Officer plainly understood and relied upon these legal principles in reaching her conclusion on the issue of FAPE. While the Slaters have expressed strong dissatisfaction with Bobby's progress in the District and contend that the Wolf School is the best placement for him, they have not met their burden of establishing that the Hearing Officer erroneously concluded that the District's proposed seventh-grade IEP would provide Bobby with FAPE. The Hearing Officer correctly followed and applied the applicable law under IDEA and also conducted a thorough review of the evidence presented to her over four hearing days. This Court has reviewed the underlying record and finds that the Hearing Officer's conclusions have sufficient evidentiary support and thus are entitled to "due deference."

The Hearing Officer was faced with conflicting evidence on the issue of Bobby's progress in reading. She concluded that the "credible evidence" did not support the Slaters' argument that Bobby had not "progressed satisfactorily" in the District. Document No. 1, Ex. 1 at 20. She also found that "it is clear that he has consistently moved forward, albeit at a pace that is slower than his

non-disabled peers." Id. (emphasis added). The Hearing Officer's conclusions are supported by competent evidence in the record and should be given "due deference."

The Slaters' expert, Dr. Carol Emerson (a clinical child neuropsychologist), summarized Bobby's diagnosis as "a language based learning disability, characteristic of severe dyslexia." Admin. R., Ex. 7 at 9. She testified that a student with "average intelligence" would be expected to make a one-year gain in reading each year while a "severely dyslexic child" would not. Tr. Aug. 10, 2006 at 64-66. The District's Director of Special Education, Maureen DeCrescenzo, agreed that Bobby was "severely dyslexic" and that he was "below grade level in reading." Tr. Sept. 6, 2006 at 52. She also stated the "obvious" in the Hearing Officer's words, Document No. 1, Ex. 1, at 18-19, that Bobby's dyslexia cannot be cured but he had made some gains in the area of reading. Tr. Sept. 6, 2006 at 58. The record supports Ms. DeCrescenzo's testimony as to Bobby's progress.

Bobby's special education teacher reported that his score on the Woodcock Diagnostic Reading Battery ("WDRB") improved from first-grade level in May of his third grade to 3.4 grade level in May of his fifth grade. Admin. R., Ex. F. She also reported that Bobby scored at the fourth-grade level at the end of sixth grade on the McLeod assessment and that he progressed two grade levels in comprehension from the start of sixth grade. Id. Bobby's sixth-grade OG instructor reported "steady gains" since February, and she advocated a summer program to continue the "momentum." Id., Ex. B. Her end-of-year report card showed "steady progress" in most areas. Id., Ex. HH. See also Tr. Aug. 23, 2006 at 123-125. The record also reflects that Bobby made progress in math, science and social studies. Admin. R., Ex. BB; Tr. Aug. 23, 2006 at 17-18, 82, 110 and 114-115.

Dr. Emerson evaluated Bobby in July 2005 and April 2006. As accurately noted by the Hearing Officer, Dr. Emerson opined in July 2005 (after Grade 5) that Bobby's "reading, spelling and written expression" averaged at Grade 2, and his reading comprehension was Grade 3.1. Document No. 1, Ex. 1 at 3; Admin. R., Ex. 8. In April 2006 (during Grade 6), Dr. Emerson reevaluated Bobby, and the Hearing Officer accurately noted that Bobby made "academic gains from .1 years to 2.6 years" in that nine-month period. Id. Although the pace of these reported gains is slow, the evidence supports the Hearing Officer's finding of "educational progress." Document No. 1, Ex. 1 at 21. Further, the issue before the Hearing Officer was the appropriateness of the District's proposed seventh-grade IEP and not the appropriateness of Bobby's prior IEPs. Thus, this case must be "judged prospectively." P.D. v. Franklin Township Bd. of Educ., No. Civ. 05-2363 (SRC), 2006 WL 753152 at *8 (D.N.J. March 23, 2006) ("lack of progress under past IEPs does not render the current IEP proposed by the District inappropriate"); see also Roland M., 910 F.2d at 992 (school district's actions cannot be "judged exclusively in hindsight" as "[a]n IEP is a snapshot, not a retrospective").

In support of their appeal, the Slaters rely heavily on the District Court decision in Nein v. Greater Clark County Sch. Corp., 95 F. Supp. 2d 961 (S.D. Ind. 2000). In Nein, the Court overturned an administrative finding of FAPE in a case brought by parents of a twelve year old dyslexic child. However, the Nein case is distinguishable. First, the student in Nein had made no progress after three years of special education services, and as a fourth grader "could not even read signs to know which public restroom he should use." Id. at 963. In addition, the Court noted an "astonishing" twenty-point drop in the student's I.Q. and described him as "functionally illiterate."

Id. at 963, 977. Second, unlike this case, the hearing officer who presided over the initial administrative hearing did not find FAPE. Id. at 964. That initial administrative decision was reversed by an intermediate board of appeals in a split 2-1 decision. Third, despite the lack of any progress, the school district in Nein proposed to stand pat and continue with the same teaching program. Id. at 972. Finally, the School District had a "policy of not retaining students at a particular grade level" and used a modified grading scale which called into question the evidentiary value of the student's grade promotions. Id. at 977-978.

The Court in Nein described the facts before it as "extreme" and held that where a student "made no transferable progress in three years, and where there was no indication the public school was ready and able to change direction, the limits of 'due weight' and judicial deference to school authorities have been exceeded." Id. at 975. The facts in this case are plainly distinguishable from those found to be "extreme" by the Court in Nein. As noted above, the Hearing Officer made a supported finding of academic progress and, as will be discussed below, the District was willing to modify its IEP and proposed an increased level of services for Bobby in seventh grade.

The Slaters specifically challenge the District's proposal to reduce the amount of Bobby's intense reading instruction from 1.5 hours per day in sixth grade to .7 hours per day in seventh grade. The Slaters argue that, given Bobby's dyslexia and reading challenges, this proposed change is "unfathomable and unacceptable." Document No. 7 at 9.[3] While the reduction is undisputed, it is misleading to focus on only one element of the District's proposed seventh-grade IEP, particularly

[3] At the hearing, Bobby's elementary special education teacher was asked about the reduction and said it should be "monitored closely." Tr. Aug. 23, 2006 at 61. The Slaters point to this comment as evidence that the reduction deprived Bobby of FAPE. This Court disagrees. The comment evidences the teacher's concern for Bobby's progress and states the obvious that his progress in all areas should be monitored as he transitions to middle school.

since Bobby was scheduled to transition from elementary to middle school. It is more accurate to look at the totality of the proposed IEP and to compare the overall level of services offered in seventh grade to those provided in sixth grade. Such a comparison supports the Hearing Officer's finding that Bobby's services were "increased over the years." Document No. 1, Ex. 1 at 21.

Both the sixth- and seventh-grade IEP provided for three, forty-minute periods per week of one-on-one OG instruction and two, thirty-minute periods of LB instruction (the seventh-grade LB would have been in class, while the sixth grade was a "pull-out"). Both provided for special education teacher support in the subjects of math, science and social studies. However, the record indicates that Bobby had multiple special education teachers in sixth grade and less than daily support in science and social studies. In the seventh-grade IEP, Bobby was scheduled for daily support in all subjects by the same special education teacher. In fact, this same special education teacher would be with Bobby for his <u>entire</u> school day. Although his intensive reading instruction was reduced, the proposed seventh-grade IEP provided for a smaller class size for reading (five versus seven students) and included an additional daily resource period of .7 hours during which the special education teacher could further support Bobby's reading. The same seventh-grade special education teacher is OG certified, and again, would also have been Bobby's one-on-one OG instructor.

In addition, in connection with developing Bobby's seventh-grade IEP, the District engaged TechACCESS of RI to evaluate whether assistive technology could be used to increase, maintain or improve Bobby's reading and writing skills. Admin. R., Ex. N. The TechACCESS consultant made a number of recommendations in her March 6, 2006 report including the acquisition of a

Digital Talking Book Player and two software programs, Co:Writer and Write:OutLoud, to assist Bobby. Id. The Digital Talking Book Player is a "small and light weight device...designed to make audio books more accessible by allowing students to navigate more easily through text and 'bookmark' places for later review." Id. at 5; Tr. Sept. 6, 2006 at 19-20. The Co:Writer and Write:OutLoud programs are "designed to work together" – Co:Writer is a word prediction program and Write:OutLoud is a word processing program that gives students auditory and visual feedback when writing. Id., Ex. N at 4; Tr. Sept. 6, 2006 at 18-19. By letter dated May 19, 2006, Ms. DeCrescenzo advised the Slaters that the District ordered and received these recommended acquisitions for Bobby. Admin. R., Ex. L.

The Slaters were present and attentive at the June 11, 2007 hearing in this matter. A review of the record makes it clear that they are concerned and supportive parents who faced a difficult decision in 2006 regarding Bobby's school placement. They maintained open communications with the District, and Mrs. Slater testified that, although she was dissatisfied with Bobby's progress, she believed that the District had his best interests in mind. Tr. Aug. 16, 2006 at 46-47. Although an IEP was in place for Bobby, the Slaters were not satisfied, and they faced the uncertainty of his transition from elementary to middle school with new teachers, specialists, administrators, classmates and social challenges. Since Bobby never attended the middle school for seventh grade, no one can state with any level of certainty whether Bobby's transition would have been successful or unsuccessful. The Hearing Officer certainly did not have a crystal ball enabling her to see into the future, and she was forced to weigh competing opinions on the topic. The Slaters had to make a similar "blind" decision, and were ultimately of the opinion that the Wolf School was a better

placement for Bobby. While the Slaters may well be correct about the Wolf School, the issue before the Hearing Officer was not whether the Wolf School was better than the District. The issue was whether the District's proposed seventh-grade IEP would have provided Bobby with FAPE. The Slaters have not met their burden of establishing that the Hearing Officer erroneously decided this issue in favor of the District. Thus, the Hearing Officer's decision as to FAPE must be affirmed.

**B. The Slaters Did Not Establish that Bobby Was Tested Without Consent**

In Count II of their Complaint, the Slaters allege that, "[o]n or about May 5, 2006, [Bobby's special education teacher] violated the IDEA and the[ir] substantive and procedural due process rights...by administering the Woodcock Diagnostic Reading Battery to Bobby, despite knowing that the [Slaters] had declined to grant permission for such testing." Document No. 1 at ¶ 89. The Slaters contend that the results of this testing would have supported their argument for placement at the Wolf School, and that the teacher "destroyed and/or suppressed" the test results and gave false testimony when she denied under oath that the test had been administered. Id. at ¶¶ 90-91.

It is undisputed that parental consent was required for such testing and that the Slaters did not consent to this particular testing in 2006. Tr. Aug. 23, 2006 at 69. Document No. 3 at ¶¶ 87, and 88. It is also undisputed that the Slaters bore the burden of proving that the test was administered without their consent in violation of IDEA. The dispute centers on whether the test was in fact administered to Bobby in May 2006.

This dispute was not specifically the subject of the Slaters' impartial due process hearing request. At the hearing in this case, counsel for the Slaters indicated that the issue came to his attention while reviewing the District's proposed 2006-2007 IEP. The IEP indicates that Bobby was

given a WDRB (Woodcock Diagnostic Reading Battery) on May 5, 2006, and that he scored 3.5. Admin. R., Ex. I. The Slaters did not offer any other evidence that the test was given without their consent. The District offered two pieces of evidence to counter the Slaters' claim. The first was a "summary of progress" document prepared by Bobby's special education teacher in June 2006. Admin. R., Ex. F. The document provides that "[i]n May of grade 5, Bobby scored at the 3.4 grade level at the 5th % tile. This test was not repeated in grade 6 due to parents not willing to provide permission to test." Id. (emphasis added). See also id., Ex. II. Bobby's special education teacher testified under oath that she authored this document and that it was accurate. Tr. Aug. 23, 2006 at 32-33.

Bobby's special education teacher was thoroughly cross-examined by the Slaters' counsel regarding this issue. In response to this questioning, the teacher testified under oath that the indication on the 2006-2007 IEP that the WDRB test was administered in 2006 was "a mistake, I punched in the wrong date." Tr. Aug. 23, 2006 at 71. She unequivocally testified that the WDRB was not given to Bobby in 2006, and counsel's repetitive questioning on cross-examination ultimately prompted an "asked and answered" objection from the District's counsel. The following excerpt of the teacher's cross-examination from the hearing transcript is illustrative:

> Q. That's not the wrong date, is it?
>
> A. Yes.
>
> Q. How is it wrong?
>
> A. I made a mistake, I punched in the wrong date.
>
> Q. When was it given in 2005? What was the date from 2005?

A. May 24th.

Q. So it wasn't even -- you didn't type in the wrong date, did you, it's not the same --

A. I didn't give him that test again.

Q. I am asking you, what does it say?

A. It does say May 5 and that is an error.

Q. How about the next line, do you have a score there?

A. I am sorry?

Q. Did you have a score there?

A. Yes, that would be the test -- see, you should have had the date from fifth grade because that was the last time -- usually you always put a standardized test in there and that's the last time a standardized test was given.

Q. What was the score from 2005?

A. 3.4.

Q. What's the score that you typed in there?

A. 3.5.

Q. You typed that wrong, didn't you?

A. It looks like I did.

Q. So your testimony is you typed in the wrong date and you typed in the wrong score?

A. Unless -- yes, I guess I did, yes.

Q. How did you do that?

MR. HENNEOUS: Objection.

A. I am trying to think right now what I could have been looking at. When I type these up on my lunch break usually, I have papers all over the place. I had to go back to another file to get old testing because I didn't have current testing on him. Now, I am not sure what exactly I grabbed, but I made an error.

Q. You made an error with the wrong date and a completely different score?

A. I did.

Q. From the previous year?

A. I did.

MR. HENNEOUS: It's been asked and answered already.

A. And I swore with my right hand up earlier. It is illegal for me to administer a standardized testing without parent permission and the last thing --

MS. HOBSON: I don't want to argue about this. The witness has testified that she didn't administer any testing in May of '06, Woodcock Johnson. If you got evidence to the contrary, you can present this, but the witness has identified a mistake in the IEP.

MR. SANKEY: I think my evidence to the contrary, with all due respect, is exactly what I am asking her, she has identified a completely different date and a completely different score. I don't know how much more evidence I am going to get if the test was administered.

MR. HENNEOUS: The objection is she has testified that was a mistake. It was a typo. It's the wrong thing, and your point, if that's the evidence, that's the evidence.

MS. HOBSON: We have a difference of a score from 3.4 to 3.5.

MR. SANKEY: I think it would be completely significant if you had a 3.4 a year before and then this year a 3.5.

> MS. HOBSON: Like I said, this witness has testified she didn't give the test, the parents refused to give her permission. If you have evidence to the contrary, you can present it, and I've got the notes on this. So if you come up with a Woodcock Johnson that was administered by this woman in May of '06, then I know she didn't tell us the truth or forgot about it.
>
> MR. SANKEY: And I'm asking her questions on what she wrote on the IEP.
>
> MS. HOBSON: She told us it was a mistake.
>
> MR. SANKEY: I guess it would be difficult for me to come up with a test.
>
> MS. HOBSON: The parents will certainly know whether if they refused permission for the test, so.
>
> MR. SANKEY: The parents were asked for permission after May 5.
>
> MR. SANKEY: I don't have anything further.

Tr. Aug. 23, 2006 at 71-75.

From my review of the transcript, it is evident that the cross-examination of the teacher was thorough but simply unsuccessful in convincing the Hearing Officer that the teacher was providing false testimony. The Slaters did not offer any other evidence on the issue. At the hearing in this matter, the Slaters' counsel argued that he was "completely cut off from the questioning" of the teacher on this issue. However, the transcript reveals that the District's counsel made a proper objection and, after argument on the issue, the Slaters' counsel did not seek to continue his cross-examination and stated "I don't have anything further." Tr. Aug. 23, 2006 at 75. The Hearing Officer did not "completely cut off" further cross-examination as argued. In addition, the Slaters' counsel has not identified what questions, if any, he was not allowed to ask the teacher, or what

additional evidence, if any, he was not allowed to introduce on the issue. The bottom line is that the Slaters made their point based on the evidence of record, but it was not convincing to the Hearing Officer. Cf. United States v. Espinoza, _____ F.3d _____, 2007 WL 1696150 (1st Cir. June 13, 2007) ("when two or more legitimate interpretations of the evidence exist, the factfinder's choice between them cannot be deemed clearly erroneous" and thus the factfinder's choice of "a reasonable (though not inevitable) inference from a particular combination of facts...is entitled to deference"). The Hearing Officer's interpretation of this evidence and credibility determination is entitled to deference, and this Court sees no basis to reverse the Hearing Officer on this issue and conclude that the teacher committed perjury without observing her demeanor as a witness.

The Slaters argue that the Hearing Officer's failure to address, or even mention, the "missing test issue" in her decision "demonstrates the arbitrary and capricious character of her findings." Document No. 7 at 23-24. At the hearing, their counsel went so far as to assert that this was indicative of the Hearing Officer's "bias" against the Slaters. This Court sees no basis for either argument.

While it is true that the Hearing Officer did not address the "missing test issue" in her written decision, it is clear from her statements at the hearing that she credited the special education teacher's denial that the test was given to Bobby in 2006, and the Slaters thereafter offered no further evidence on the issue. Tr. Aug. 23, 2006 at 74-75. Also, the issue before the Hearing Officer was whether the District's proposed 2006-2007 IEP offered FAPE to Bobby. There is no indication that the Slaters sought an administrative hearing on the "missing test issue" or formally presented

it to the Hearing Officer as an independent claim.[4] The Slaters' post-hearing brief submitted to the Hearing Officer focuses on the issue of FAPE and whether Bobby had made "meaningful progress" in his education. The Slaters did not argue in their brief to the Hearing Officer that the test in dispute was an independent IDEA violation. In fact, the "missing test issue" is only discussed in two footnotes in their brief (no.2 at 10 and no.7 at 26) and solely in connection with the Slaters' challenge to the District's claim of "meaningful progress." Given the manner in which the issue was raised by the Slaters and addressed by the Hearing Officer during the hearing, her failure to specifically address the issue in her written decision is not arbitrary, capricious or indicative of bias. Finally, as noted in Section A above, the Hearing Officer dealt directly with the issue of progress in her decision and found that "[a]lthough there is contradictory evidence as to the student's progress, it is clear that he has consistently moved forward, albeit at a pace that is slower than his non-disabled peers." Document No. 1, Ex. 1 at 20.

**Conclusion**

For the reasons stated, I recommend that the Slaters' Motion for Summary Judgment (Document No. 7) be DENIED and that the District Court conclude that the Hearing Officer's November 7, 2006 determination is legally correct, supported by the record and should be AFFIRMED.

---

[4] Generally, a parent or guardian asserting a violation of IDEA must exhaust administrative remedies through the due process hearing before filing suit in state or federal court. See Rose v. Yeaw, 214 F.3d 206, 210 (1st Cir. 2000); and Frazier v. Fairhaven Sch. Comm., 276 F.3d 52, 59 (1st Cir. 2002). In response to Count II, the District has not raised failure to exhaust as an affirmative defense, and this Court considers the argument waived. See e.g., Mosely v. Bd. of Educ. of City of Chicago, 434 F.3d 527, 533 (7th Cir. 2006) ("failure to exhaust is normally considered to be an affirmative defense").

Any objection to this Report and Recommendation must be specific and must be filed with the Clerk of the Court within ten (10) days of its receipt. Fed. R. Civ. P. 72(b); LR Cv 72. Failure to file specific objections in a timely manner constitutes a waiver of the right to review by the District Court and the right to appeal the District Court's decision. United States v. Valencia-Copete, 792 F.2d 4 (1st Cir. 1990).

/s/ Lincoln D. Almond
LINCOLN D. ALMOND
United States Magistrate Judge
June 28, 2007